JAMES R. LAWRENCE, III (*pro hac vice* to be filed)
jlawrence@envisage.law
ENVISAGE LAW
2601 Oberlin Road, Suite 100
Raleigh, North Carolina 27608
Phone: 919.755.1317
Facsimile: 919.782.0452

SEAN P. GATES (SBN 186247)
sgates@charislex.com
CHARIS LEX P.C.
225 S. Lake Ave., Ste. 300
Pasadena, CA 91101
Phone: 626.508.1715
Facsimile: 626.508.173

*Attorneys for Plaintiffs Minds, Inc.,*
*Tim Pool, and The Babylon Bee LLC*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| **MINDS, INC., TIM POOL, and THE BABYLON BEE LLC,** | Case No.: |
| **Plaintiffs,** | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| **v.** | |
| **ROBERT A. BONTA, Attorney General of California, in his official capacity,** | |
| **Defendant.** | |

ENVISAGE LAW

COMPLAINT

ENVISAGE LAW

## INTRODUCTION

1.       In 2013, then-Lieutenant Governor Gavin Newsom wrote about the importance of the flow of information in the Internet age. "We no longer live in a world where Walter Cronkite is the single voice of news for all Americans," he wrote. Gavin Newsom, *Citizenville: How to Take the Town Square Digital and Reinvent Government*, at 38 (2013). "Today people get their news, information, and opinions from thousands of different sources—Websites, blogs, cable channels, Twitter feeds . . . . That's not going to change, nor should it. But we have to strive toward making sure that raw information is available to everyone, so people can make their own decisions." *Id.* Newsom even criticized dominant Big Tech firms, including Google and Facebook, for denying "those who *do* want to hear all sides" the chance to listen to other views. *Id.* at 37. Citing the potential of technology to challenge political power, Newsom observed that "[t]hose in authority may not like it, but this is the wave of the future, and they're going to have to deal with it." *Id.* at 35.

2.       While Governor Newsom appears to have abandoned this view, Supreme Court precedent still recognizes that "[w]hile in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast democratic forums of the Internet' in general, and social media in particular." *Packingham v. North Carolina* (quoting *Reno v. American Civil Liberties Union*, 521 U. S. 844, 868 (1997)). With Governor Newsom's approval, California's AB 587 coerces social media companies into restricting various forms of constitutionally protected speech from "vast democratic forums" of the Internet—precisely the opposite of "deal[ing] with it."

3.       It is well understood that California has an outsized impact on public policy. The Golden State's laws and regulations often drive change across the entire American economy. The reason is simple: the private sector can either comply with Sacramento's edicts or miss out on participating in the world's fourth largest economy. "Throughout our history," Attorney General Rob Bonta boasted, "justice has been California's most important export." Rob Bonta (@RobBonta), Twitter (May 1, 2021, 2:07 PM), https://twitter.com/RobBonta/status/1388555614914220036.

4.       What is true for environmental regulation and consumer protection regimes like The Safe Drinking Water and Toxic Enforcement Act of 1986, also known as Proposition 65, is also true here.

1

ENVISAGE LAW

The largest social networks including Reddit, Alphabet (parent to YouTube and Google), Meta (parent to Instagram and Facebook), and Twitter are all headquartered in the State of California. That means California has a direct influence on social media policy.

5.     Those who wield political power in the Golden State have been candid about their displeasure with the speech being published on social media platforms. California Governor Gavin Newsom and Attorney General Bonta have both expressed a desire to use state power to chill speech they do not approve of, constitutionally protected expression they refer to with derogatory labels like "disinformation," "hate speech," and "extremism."

6.     AB 587, the statute at issue in this case, is a vehicle for these unconstitutional ambitions. AB 587's proponents present the law as a simple transparency measure, analogizing the measure to the array of other California regulations businesses already labor under. The reality is every bit as burdensome but much less benign. AB 587 is viewpoint discriminatory and designed to chill expression of lawful speech the State of California disapproves of to, as the legislation's sponsor put it, "protect Californians from hate, harassment and lies spread online."

7.     While aimed primarily against large social media platforms, AB 587 chills speech of those platforms' users by incentivizing large platforms to censor speech based on viewpoint. The statute also impacts smaller social networks by imposing an industry standard of viewpoint-based censorship. In this regard, the data the platforms are required to provide the State under AB 587 is not about satisfying some academic curiosity, but rather to cast platforms that do not censor enough as pariahs.

8.     AB 587's proponents have repeatedly acknowledged that it would be unconstitutional for California to mandate censorship of the type of speech AB 587 regulates. However, this law, which is explicitly designed to chill constitutionally protected speech based on viewpoint, still violates the First Amendment. At the same time, AB 587 does not define terms such as "disinformation," "hate speech," and "extremism," creating an overbroad definition, leading to overly broad enforcement powers in violation of the Fourteenth Amendment. *See Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1891 (2018) ("It is self-evident that an indeterminate prohibition carries with it the opportunity for abuse." (internal quotations omitted)).

ENVISAGE LAW

9.      Plaintiffs in this action are an emerging social media network and two prominent social media users. AB 587 is a direct attack on Plaintiff Minds, Inc.'s business model, expansion plans, and ability to attract investment. Meanwhile, Plaintiffs Tim Pool and The Babylon Bee LLC have tens of millions of online followers. All three Plaintiffs have significant followings in California, across the rest of the country, and around the world. If AB 587 is not blocked, Plaintiffs stand to lose their hard-won audiences under the weight of California's unconstitutional experiment in speech regulation. Unlike some of AB 587's proponents, Governor Newsom and Attorney General Bonta have been candid about the legislation's goal: to prevent Plaintiffs' perspectives from reaching Californians. Plaintiffs cannot stand idly by while California chills their speech rights.

**PARTIES, JURISDICTION, AND VENUE**

10.      Plaintiff Minds, Inc. is a Delaware corporation with a principal place of business in the State of Connecticut. Minds Inc. operates the social networking app Minds, and has users across the country, including in the State of California. Minds was founded in 2011 and launched in 2015. Minds is available on its website Minds.com and as an app for Android and iPhone.  Minds' stated mission "is to bring Internet freedom back to social media."

11.      Plaintiff Tim Pool is an active social media content creator across numerous platforms with more than 5 million followers. He has more than 4 million YouTube subscribers and his videos have received more than 1.5 billion total views. He also has more than 1.5 million Twitter followers. Pool's ideological adversaries frequently accuse him of creating "hate speech," "disinformation," and "extremism"—labels he strongly rejects—often with the explicit intention of pressuring social networks to deplatform him.

12.      Plaintiff The Babylon Bee LLC is a Florida limited liability company with a principal place of business in Jupiter, Florida. The Bee publishes satirical news articles on its website, www.babylonbee.com, which averages more than 20 million viewers per month. Critics maintain that "even if the Babylon Bee's satire itself should not be considered misinformation, its satire draws on and reinforces actual misinformation and conspiracy." Parker J. Bach, *Can the Right Make Good Satire Without Collapsing Due to Fake News*, Slate, June 22, 2021, https://slate.com/news-and-politics/2021/06/babylon-bee-satire-from-right.html. The Bee, which posts its satire to Twitter,

3
COMPLAINT

Facebook, Instagram, and YouTube, has more than 6.8 million followers across those four social media platforms. It is widely believed Twitter's decision to suspend The Bee in March 2022 motivated Elon Musk to purchase the company.

13.     Defendant Rob Bonta is the Attorney General of the State of California. Attorney General Bonta is sued here in his official capacity. Attorney General Bonta is charged with enforcing AB 587.

14.     This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, specifically the First and Fourteenth Amendments to the United States Constitution.

15.     Venue is proper in this judicial district because the Attorney General of California has offices in this District.

**BACKGROUND**

**I.      Both AB 587's plain text, and the statute's effect, discriminates against constitutionally protected speech and chills lawful expression.**

16.     On September 13, 2022, California Governor Gavin Newsom signed AB 587 into law. The statute went into effect on January 1, 2023. Given the statute's placement in California's Business and Professions Code nestled alongside obscure regulations for boxing, wrestling, martial arts, and home furnishings, *see* Cal. Bus. & Prof. Code §§ 18400-22949.80, some might conclude that AB 587 is just another regulation a business must comply with in order to participate in our nation's largest—and the world's fourth-largest—economy.

17.     Governor Newsom unveiled AB 587's true design. In the very first sentence of its press release announcing his signing AB 587 into law, the Governor's office explained that AB 587, a "first-of-its-kind social media transparency measure," is really designed to "protect Californians from hate and disinformation spread online." Press Release, Office of Gov. Gavin Newsom, Governor Newsom Signs Nation-Leading Social Media Transparency Measure (Sept. 13, 2022), https://www.gov.ca.gov/2022/09/13/governor-newsom-signs-nation-leading-social-media-transparency-measure/. "California will not stand by as social media is weaponized to spread hate and disinformation that threaten our communities and foundational values as a country," Governor Newsom explained further. *Id.* Governor Newsom did not further define what he meant by "hate" or "disinformation."

18.     In November 2022, Attorney General Bonta took up these themes in a letter to Meta, YouTube, Twitter, TikTok, and Reddit, platform with billions of users. "Disinformation and misinformation pose very real and growing threats to our democracy and to the rule of law," Attorney General Bonta wrote. Letter from Attorney General Bonta to Meta Platforms, Inc. et al., Nov. 3, 2022, at 1, https://oag.ca.gov/system/files/attachments/press-docs/Election%20Disinformation%20and%20Political%20Violence.pdf. "In advance of the upcoming November 2022 midterm election, social media platforms *must* take critical steps to stop the spread of disinformation and misinformation that attack the integrity of our electoral processes." *Id.* at 2 (emphasis added). In the conclusion to his letter, Attorney General Bonta "implore[d]" the five platforms "to do more to rid your platforms of the dangerous disinformation, misinformation, conspiracy theories, and threats that fuel political violence, spread fear and distrust, and ultimately chill our democratic process." *Id.* at 8.

19.     Attorney General Bonta cited various legal tools in his eight-page letter, including AB 587. "In 2024, social media platforms will also have additional transparency obligations, as required by recent state legislation," Attorney General Bonta wrote, citing AB 587. *Id.* at 4. That law "requires disclosures on content moderation practices as it relates to extremism or radicalization, disinformation or misinformation, and foreign political interference, among other areas." *Id.* Like Governor Newsom, Attorney General Bonta did not attempt to define those terms in his letter.

20.     In the very next paragraph, Attorney General Bonta threatened the platforms, promising that "[t]he California Department of Justice will not hesitate to enforce these laws against any individual or group that violates them." *Id.* The reference to "these laws," includes AB 587. Attorney General Bonta went further, targeting corporate executives, explaining that "given social media's prominence and influence in American political discourse, your companies and you as these companies' executives share a responsibility at your disposal to combat the dissemination of disinformation that interferes with our electoral system and to report to law enforcement illegal activity detected on your respective social media platforms that interferes with Americans' right to vote." *Id.* Attorney General Bonta noted platforms "have a duty to cooperate fully and expeditiously with law enforcement investigations,"

ENVISAGE LAW

1   regarding "[d]isinformation and election crimes hosted on your platforms," which "should be dealt with
2   immediately." *Id.*

3       21.     Governor Newsom and Attorney General Bonta's candid remarks stand in contrast to the
4   legislative counsel's digest, which describes the bill in much more mundane terms—analogizing the
5   statute to laws which require an online "service to make its privacy policy available to consumers." As
6   detailed further below, far from a mere "transparency measure," AB 587 represents a state-sanctioned
7   assault on pure political speech.

8       **A.    AB 587 targets constitutionally protected speech.**

9       22.     AB 587 contains seven sections. Social media companies subject to the statute must "post
10  terms of service" and provide certain reporting to Defendant or risk being "liable for a civil penalty not
11  to exceed fifteen thousand dollars ($15,000) per violation per day." Cal. Bus. Prof. Code § 22678(a)(1)-
12  (2). AB 587 is broad, in that it covers any "social media company" with one hundred million dollars or
13  more "in gross revenue during the preceding calendar year." *See id.* § 22680. This limitation is not tied
14  specifically to revenues derived from social media activity. Conceivably, if an entity or person derives
15  $100 million in gross revenue, and social media is one component of its business, then AB 587 would
16  apply. Revenues from parent companies apparently also count toward the $100 million annual gross
17  revenue threshold.

18      23.     The bill defines a "social media company" to include "a person or entity that owns or
19  operates one or more social media platforms." *Id.* § 22675(d). A "social media platform," in turn, is any
20  "public or semipublic internet-based service or application that has users in California" and a
21  "[s]ubstantial function" of which "is to connect users in order to allow users to interact socially" and to
22  "allow[] users" to create "a public or semipublic profile," "[p]opulate a list of other users," and "[c]reate
23  or post content viewable by other users." *Id.* § 22675(e). In addition to the revenue carveout, AB 587
24  does not apply to "email or direct messaging services." *Id.* § 22675(e)(1)(B).

25      24.     While there are some edge cases about what companies AB 587 would cover, Twitter,
26  Meta's Facebook and Instagram, TikTok, YouTube, Microsoft's LinkedIn, and Reddit would all fall
27  within the statute's scope. The law also apparently applies to Google's review system, which makes
28  billions of dollars of revenue, allows users to create profiles, follow each other, and post user generated

reviews. David Nield, *How You Can Use Google Maps Like a Social Network*, Wired, Mar. 14, 2021, https://www.wired.com/story/how-to-google-maps-social-tips/. Given AB 587's wording, the statute would also cover Apple products such as Apple Podcasts, which also allow users to create profiles, create user generated content, and "follow" and "subscribe" to other users. *Follow on Apple Podcasts*, https://podcasters.apple.com/support/3298-follow-on-apple-podcasts.

25.     AB 587 contains two particularly problematic provisions. *First*, to avoid being punished by the State of California, social media companies must post state-sanctioned "terms of service." The terms are not optional. Every covered social media company "shall post terms of service" and "in a manner reasonably designed to inform all users of the social media platform of the existence and contents of the terms of service." Cal. Bus. & Prof. Code § 22676(a). The terms of service must also include each of the following three items:

> (1) Contact information for the purpose of allowing users to ask the social media company questions about the terms of service.
>
> (2) A description of the process that users must follow to flag content, groups, or other users that they believe violate the terms of service, and the social media company's commitments on response and resolution time.
>
> (3) A list of potential actions the social media company may take against an item of content or a user, including, but not limited to, removal, demonetization, deprioritization, or banning.

*Id.* § 22676(b).

26.     AB 587 requires social media companies to engage in some form of content moderation. The companies must maintain some form of a system to allow users to "flag content, groups, or other users." *Id.* § 22676(b)(2). The statute says companies' terms of service must include "commitments on response and resolution time." *Id.* That means complaints require some response by a certain time—no response or an untimely response is not an option.

27.     AB 587 defines "terms of service" to mean "a policy or set of policies adopted by a social media company that specifies, *at least*, the user behavior and activities that are permitted . . ., and the user behavior and activities that may subject the user or an item of content to being actioned." *Id.* § 22676(b) (emphasis added). Related, content is "actioned" when a company takes "some form of action,

including, but not limited to, removal, demonetization, deprioritization, or banning, against the relevant user or relevant item of content." *Id.* § 22676(a).

28.     The *second* major requirement within AB 587 is a so-called "terms of service report." Under this mandate, social media companies must provide Attorney General Bonta with, among other things, a "statement of whether the current version of the terms of service defines each of the following categories of content, and, if so, the definitions of those categories, including any subcategories" of the following:

(A) Hate speech or racism.

(B) Extremism or radicalization.

(C) Disinformation or misinformation.

(D) Harassment.

(E) Foreign political interference.

*Id.* § 22677(a)(3).

29.     In addition, AB 587 requires extensive reporting about "[i]nformation on content that was flagged by the social media company as content belonging to any of the categories described in paragraph (3)," meaning the eight categories described above. *Id.* § 22677(a)(5). Companies must provide details regarding "all of the following" data points:

(i) The total number of flagged items of content.

(ii) The total number of actioned items of content.

(iii) The total number of actioned items of content that resulted in action taken by the social media company against the user or group of users responsible for the content.

(iv) The total number of actioned items of content that were removed, demonetized, or deprioritized by the social media company.

(v) The number of times actioned items of content were viewed by users.

(vi) The number of times actioned items of content were shared, and the number of users that viewed the content before it was actioned.

(vii) The number of times users appealed social media company actions taken on that platform and the number of reversals of social media company actions on appeal disaggregated by each type of action.

*Id.* § 22677(a)(5)(A)(i)-(vii). This reporting must be further disaggregated into five additional categories, such as "category of content, including any relevant categories described in paragraph (3)" as well as information regarding "[h]ow the content was actioned, including, but not limited to, actioned by company employees or contractors, actioned by artificial intelligence software, actioned by community moderators, actioned by civil society partners, and actioned by users." *Id.* § 22677(a)(5)(B). Even though the federal government and various state governments have "actioned" content on social media platforms, California's reporting requirement does not include those state actors.

30. Not all content is equal under AB 587. Based on the plain language of the law, these burdensome reporting requirements, which are attached to significant penalties, only apply to certain types of speech, namely "hate speech" "racism," "extremism," "radicalism," "disinformation," "misinformation," "harassment" or "foreign political interference." Except for certain types of "harassment" and "foreign political interference,"[1] these otherwise undefined categories of speech are plainly protected by the First Amendment. Notably, even though child pornography is not protected by the First Amendment, and though social media has been linked to the proliferation of this content, *see, e.g.*, Terry Reith, *Rise of social media leads to flood of child porn images*, CBC News, May 26, 2017, https://www.cbc.ca/news/canada/edmonton/social-media-exploitation-1.4130160, AB 587 does not require social media companies to report on their efforts to combat child pornography.

31. Instead of using the statute as an opportunity to examine the sexual exploitation of children through social media, the California State Assembly chose to focus its attention on categories of speech which have legal protection. "Hate speech" and "racism" are notoriously difficult to define, but could be considered speech that "demeans on the basis of race, ethnicity, gender, religion, age, disability, or any other similar ground." *Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017) (Alito, J., concurring). Nevertheless, this speech has been found to be protected by the First Amendment. *See R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) (striking down law prohibiting speech which would cause

---

[1] Generally speaking, foreign political propaganda is protected by the First Amendment, though disclosure requirements such as the Foreign Agents Registration Act have withstood constitutional scrutiny. *See Meese v. Keene*, 481 U.S. 465 (1987) (holding that FARA's requirement to require disclosure that certain content is "foreign propaganda" does not violate the First Amendment).

anger on the "basis of race, color, creed, religion or gender" for violating the First Amendment).

32.     Related, "[t]he term ['hate speech'] is always used pejoratively and implies a moral breach." Cherian George, Hate Speech Law and Policy, in The Int'l Encyclopedia of Digital Comm. & Soc'y (2014), https://doi.org/10.1002/9781118767771.wbiedcs139. But the Supreme Court has determined even this is subject to First Amendment protection, as abhorrent and offensive as it may be. *See Snyder v. Phelps*, 562 U.S. 443 (2011).

33.     "Disinformation" and "misinformation" are largely understood to refer to false speech about matters of public concern, including politics. While many types of false statements such as defamation, fraud, and false advertising are not constitutionally protected, false, and even intentionally false political speech, which is what "disinformation" tends to cover, is also constitutionally protected. *See United States v. Alvarez*, 567 U.S. 709, 734 (2012) (Breyer, J., concurring) (noting that the First Amendment does not permit a law which can serve as a "weapon to a government broadly empowered to prosecute falsity"); *281 Care Comm. v. Arneson*, 766 F.3d 774, 796 (8th Cir. 2014) ("The citizenry, not the government, should be the monitor of falseness in the political arena.").

34.     While the government may prohibit types of harassment—such as workplace harassment and stalking—courts have held that "[t]he First Amendment protects at least some speech that persistently annoys someone and makes him fearful . . . . There is no categorical 'harassment exception' to the First Amendments free speech clause. Though non-expressive, physically harassing conduct is entirely outside [its] ambit, deeply offensive speech is not." *United States v. Yung*, 37 F.4th 70, 78 (3d Cir. 2022) (internal quotations and citations omitted).

35.     The term "extremism" tends to refer to views that are far outside the mainstream belief, the exact type of speech the First Amendment is meant to protect. *See Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228, 243 (6th Cir. 2015) (citing neo-Nazis and Communists to show "the minority view, including expressive behavior that is deemed distasteful and highly offensive to the vast majority of people that most often needs protection under the First Amendment"); *Nieto v. Flatau*, 715 F. Supp. 2d 650, 653 (E.D.N.C. 2010) (holding that regulation prohibiting "display of 'extremist, indecent, sexist and racist' vehicle decals" violates the First Amendment.). The term "radicalization" carries similar First Amendment baggage from a bygone era. *See* Laura W. Murphy, *Will Peter King's Hearing Carry*

10

COMPLAINT

*Stigma Like Joseph McCarthy's*, ACLU, Mar. 10, 2011, https://www.aclu.org/news/national-security/will-peter-kings-hearing-carry-stigma-joseph ("[H]olding a hearing based on a flawed radicalization theory that conflates religious practices with preparation for terrorism and focuses exclusively on Muslim-Americans is misguided, discriminatory and counterproductive.").

36.     The First Amendment does permit regulation of "foreign political interference" insofar as it means "foreign propaganda." *Meese v. Keene*, 481 U.S. 465 (1987).  However, even these regulations must not impact those that "may incidentally be of benefit to foreign interests, even though such acts are part of the normal course of those persons' own rights of free speech, petition or assembly." *Attorney Gen. v. Irish People, Inc.*, 796 F. 2d 520, 524 (D.C. Cir. 1986).

37.     The practical effect of AB 587 is clear. To head off potential liability under the statute, and to keep the State of California's hands off its operations, social media companies must create and enforce policies related to disfavored content. Selectively requiring transparency of the moderation policies of only certain viewpoints, using negative pejorative language, is a facial attempt to encourage increased moderation of such views.

38.     The California State Assembly was aware that the specifically targeted speech is protected by the First Amendment. The Senate Judiciary Report acknowledged, "any specific mandates to remove some subset of this broad swath of content could run afoul of the First Amendment" because "as a general rule, the government 'may not suppress lawful speech as the means to suppress unlawful speech.'" Cal. Senate Judiciary Comm., Social media companies: terms of service, June 28, 2022, at 15, *available at* https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202120220AB587# (quoting *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002)).

39.     The Senate Judiciary Committee argued that "[b]ecause this bill simply seeks transparency into what content moderation practices are being deployed and their outcomes, it likely does not run afoul of these laws." *Id.* The Committee further justified AB 587's constitutionality by noting "the case law generally affords a wide berth to laws that regulate commercial speech and that involve disclosure requirements that involve conveying factual information that has sound public policy justification, such as food labeling." *Id.*

11
COMPLAINT

ENVISAGE LAW

40.     Simply because large social networks are commercial websites, mandating regulations of terms of service as they relate to moderation of political speech is facially not commercial speech. Indeed, the Supreme Court has struck down state labeling disclosure requirements on First Amendment grounds when those regulations do not "simply have an effect on speech, but [are] directed at certain content and [are] aimed at particular speakers" and thus are not content neutral. *Sorrell v. IMS Health Inc.*, 564 US 552, 567 (2011).

**B.     AB 587's vague, ambiguous, and onerous terms make compliance impracticable.**

41.     Even if all these problems could be solved, California's standards are amorphous and impracticable. Consider these examples. In August 2021, Governor Newsom claimed that "this disease," meaning COVID-19, "is now a choice." John Woolfolk, *Gavin Newsom claims unvaccinated people can COVID pandemic in a month. Can they really?*, Santa Cruz Sentinel, Aug. 13, 2021, https://www.santacruzsentinel.com/2021/08/13/newsom-unvaccinated-can-end-covid-pandemic-in-a-month-can-they-really/. "If we want to end this pandemic and disease, we can do it in a month," he said. *Id.* A professor at the University of California Irvine refuted Governor Newsom, saying "[t]he pandemic won't be over in 30 days no matter what we do," while calling the Governor's remarks "more a homily about the value of vaccination than a declaration of science," and that "[h]e's saying something to impress on his constituents the value of vaccination." *Id.* Governor Newsom's comments were published on Twitter. San Diego: Dialed In (@saddialedin), Twitter (Aug. 12, 2021, 9:49 AM), https://twitter.com/sddialedin/status/1425816637349924867?s=20.

42.     How should social media companies report Governor Newsom's comments under AB 587? Were his statements "misinformation" regarding the utility of the COVID-19 vaccines to bring an end to the pandemic? Should social media companies report Governor Newsom's comments as "hate speech" under AB 587 because of the clear implication that people who chose not to get a COVID-19 vaccine are responsible for continued death and suffering? Do his comments constitute "harassment" of unvaccinated people? Should Governor Newsom's comments be construed by the state of knowledge at the time he made them or in view of the current state of knowledge?

43.     Consider the problems of "extremism." There are multiple Twitter accounts which exhibit "extreme" dedication to various pursuits, including Extreme Conditioning (@ExtremeCon),

ENVISAGE LAW

Extreme Fitness (@XFitnessFanatic), and Extreme Sports (@ExtremeTV). Should this content be categorized as "extremism" under AB 587? Are institutions dedicated to studying "extremes" in the context of climate change publishing "extremism"? *See, e.g.*, ARC Centre for Excellence for Climate Extremes (@ClimateExtremes), https://twitter.com/ClimateExtremes. What about content from California State University, San Bernandino's Center for the Study of Hate and Extremism, which publishes its content to YouTube? Should the Center's content, which critically analyzes the efforts of other groups, be categorized as "extremism"?

44. The term "foreign political interference" presents additional challenges. Must the content itself originate from a foreign government or is it sufficient for a user of a social media platform to promote the interests of a foreign government? Does "foreign" refer only to interference outside the United States or does this category apply to any user of a social media platform attempting to "interfere" with the politics of another nation? Would it be "foreign political interference" for an Australian user to comment on American politics but not for an American to "interfere" with Australian politics?

45. These are just threshold inquiries. More questions are lurking in AB 587's reporting provisions. The term "content" is defined as "statements or comments made by users and media that are created, posted, shared, or otherwise interacted with by users on an internet-based service or application." Cal. Bus. & Prof. Code § 22675(b)(1). Anything "shared" on a platform is subject to AB 587, but social media companies must report, among other things, "[t]he number times actioned items of content were viewed by users." *Id.* § 22677(a)(5)(A)(v). In the case of Governor Newsom's above-cited comments about COVID-19 vaccines, assuming the content falls within one of AB 587's eight categories of disfavored speech, does this mean the platforms must report the number of views of each instance of the content at issue? In other words, are social media companies required to report the number of times Governor Newsom's comments were viewed on the platform regardless of the source?

46. AB 587 provides no clear answers to these questions. What is clear are the stakes for getting these questions wrong. Disobedient social media companies "shall be liable for a civil penalty not to exceed fifteen thousand dollars ($15,000) per violation per day, and may be enjoined in any court of competent jurisdiction." *Id.* § 22678(a)(1). Violations include "materially omit[ting] or misrepresent[ing] required information" in a terms of service report. *Id.* § 22678(a)(2)(C). In this regard,

13
COMPLAINT

a social media company that produces a report not to Attorney General Bonta's liking could face significant financial liability.

47.     AB 587 gives Attorney General Bonta freedom to second guess social media companies' efforts to categorize and report on the conduct at issue. In theory, if Attorney General Bonta finds ten "material omissions," an undefined term, in a terms of service report, he can subject a platform to penalties of up to $150,000 per day. Given the volume of content on these platforms, it is conceivable Attorney General Bonta might find hundreds if not thousands of material omissions, warranting civil penalties into the hundreds of millions of dollars. At a minimum, this financial exposure gives Attorney General Bonta leverage with which he can extract concessions from the social media companies regarding disfavored speech.

**II.     Key California political leaders, including Attorney General Bonta and Governor Newsom, have long shown a desire to restrict speech on social media based on viewpoint. Many of these leaders explicitly supported AB 587 because they believed the statute would chill expression they disapprove of.**

48.     Despite the claims that this bill simply is about transparency, AB 587's proponents have repeatedly stated the law is a response to "inadequate" level of censorship on social media and that they hope it will lead to more content moderation of disfavored, but constitutionally protected, speech.

49.     In a March 29, 2021 press release upon the bill's introduction, AB 587's primary sponsor, Assemblymember Jesse Gabriel, said the law was meant to address the fact that "efforts by social media companies to self-police have been widely criticized as inadequate." California Legislators Introduce Bipartisan Effort to Hold Social Media Companies Accountable for Online Hate and Disinformation, Mar. 29, 2021, https://a46.asmdc.org/press-releases/20210329-california-legislators-introduce-bipartisan-effort-hold-social-media. The title of Assemblymember Gabriel's press release could not be clearer regarding the legislator's intent to chill the spread of "hate" and "disinformation," which again are undefined.

50.     The April 21, 2021 Assembly Privacy And Consumer Protection report similarly included arguments in favor of the law, stating that the law was necessary because "efforts by social media companies to self-police [problematic] content have been . . . inadequate." Cal. Assembly Comm. On Privacy and Consumer Protection, Apr. 22, 2021, at 4, *available at*

https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202120220AB587.

51.    On June 21, 2021, Assemblymember Gabriel wrote that AB 587 was meant to "address. . .concerns that platforms aren't doing enough to stop the spread of misinformation and hate speech." Assm. Jesse Gabriel (@AsmJesseGabriel), Twitter (June 14, 2021, 5:37 PM), https://mobile.twitter.com/AsmJesseGabriel/status/1404553699502870529.

52.    A July 13, 2021 Senate Judiciary Report described the background of the law, referring to the need for more content moderation:

> In recent years, the clamor for more robust content moderation on social media has reached a fever pitch. This includes calls to control disinformation or "fake news," hate speech, political interference, and other online harassment.

Cal. Senate Judiciary Comm., *supra*, at 6. The Committee further noted that "[o]ne area the author specifically focuses in on as motivation for the bill is the rise of hate speech online and the real world consequences." *Id.* at 8. The Committee described how the legislature took numerous "considerations when addressing *how to approach the proliferation of these undesirable social media posts and the companies' practices that fuel the flames*." *Id.* at 11 (emphasis added).

53.    The Senate Judiciary Committee report cited supporting comments that the bill would allow "policymakers can take meaningful action to decrease online hate and extremism, and to address this growing threat to our democracy." *Id.* at 13.

54.    On July 2, 2020, AB 587's Senate sponsor Scott Wiener tweeted, "Social media platforms have a moral obligation—& need to have a legal obligation—not to become engines for violent hate speech." Senator Scott Wiener (@Scott_Wiener), Twitter (July 2, 2020, 1:32 PM), https://twitter.com/Scott_Wiener/status/1278743357032812544.

55.    On June 21, 2022, Senator Wiener stated in a press release in favor of HB 587, "Disinformation and extremism are running rampant on social media platforms, and sadly it only seems to be getting worse. We need to hold social media companies accountable for the spread of violent extremism and the racism, sexism, transphobia, and antisemitism taking over the internet." Elected Officials and Community Leaders Roll Out New Report on Online Hate and Disinformation and Call for Legislation to Require Accountability from Major Social Media Platforms, June 21, 2022, https://a46.asmdc.org/press-releases/20220621-elected-officials-and-community-leaders-roll-out-new-

15

COMPLAINT

report-online-hate-and.

56.    On June 25, 2022, a Senate Judiciary Report on the bill noted support from the Los Angeles County Democratic Party. The Party said AB 587 would address the problem that "Social media companies have behaved irresponsibly, allowing disinformation, misinformation and hate to add fuel to some of America's greatest challenges, like combating a global pandemic or grappling with longstanding social wounds around racism and misogyny, and they have also enabled the micro targeting of vulnerable individuals." Cal. Senate Judiciary Comm., June 28, 2022, at 18, *available at* https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202120220AB587.

57.    An August 15, 2022 Senate Floor Analysis quotes Assemblymember Gabriel as noting the law is meant to address the fact that "[t]he line between providing an open forum for productive discourse and permitting the proliferation of hate speech and misinformation is a fine one." Cal. Senate Rules Comm., Aug. 15, 2022, at 4, https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202120220AB58.

58.    During an August 30, 2022 press conference in support of the Bill, Assemblymember Gabriel said AB 587 "seeks to address the incredible power of social media to shape our national conversation." Cal. Assembly Democrats, *Join me to protect kids on social media!*, Aug. 30, 2022, https://www.youtube.com/watch?v=dOUiwQwU3LA&t=1s. The bill was necessary because "social media platforms aren't doing enough to address their role in promoting online hate and fueling dangerous conspiracy theories." *Id.* As shown below, Assemblymember Gabriel spoke in front of a podium with a sign with "STOP HATE" blazoned on the front.



ENVISAGE LAW

ENVISAGE LAW

59.    Upon signing the legislation on September 13, 2022, Governor Newsom said "California will not stand by as social media is weaponized to spread hate and disinformation that threaten our communities and foundational values as a country," and described the law as an "important measure to protect Californians from hate, harassment and lies spread online." Office of Gov. Gavin Newsom, *supra*.

60.    Governor Newsom's signing statement is consistent with his other public positions. In November 2016, while serving as California's Lieutenant Governor, Newsom tweeted that "CA isn't going to back down." Gavin Newsom (@GavinNewsom), Twitter (Nov. 18, 2016), https://twitter.com/GavinNewsom/status/799654735032696832. "We," a clear reference to the State he was serving, "will push back against any sign of racism, bigotry, misogyny & hate. We'll fight for our values & principles." *Id.* Here, then-Lieutenant Governor Newsom was referring to two of the eight categories of speech targeted in AB 587. He reiterated this position on New Year's Day 2017, resolving that "[m]ay '17 be a year in which we continue to push our country fwd @ stand together against any sign of hate, bigotry, or racism." Gavin Newsom (@GavinNewsom), Twitter (Jan. 1, 2017, 4:40 PM), https://twitter.com/GavinNewsom/status/815674173217443840. With his references to "any sign," Governor Newsom did not distinguish between speech and conduct.

61.    Governor Newsom has also used state power to combat misinformation and disinformation. "California is taking on vaccine misinformation & disinformation," he announced in April 2022, referring to the rollout of a new chatbot. Gavin Newsom (@GavinNewsom), Twitter (Apr. 21, 2022, 7:58 PM), https://twitter.com/GavinNewsom/status/1517291783423623169. On September 30, 2022, shortly after he signed AB 587 into law, Governor Newsom approved AB 2098, a measure aimed at preventing California health care providers from disseminating misinformation and disinformation. A federal district court later enjoined the law. *See Høeg v. Newsom*, Case No. 2:22-cv-01980-WBS-AC, ECF No. 35 (E.D. Cal. Jan. 25, 2023).

62.    The California Attorney General figures prominently in AB 587's scheme. The law requires that a "social media company shall submit to the Attorney General a terms of service report," Cal. Bus. & Prof. Code § 22677 (a), and that "[a]ctions for relief pursuant to this chapter shall be prosecuted exclusively in a court of competent jurisdiction by the Attorney General" or by certain city

17

COMPLAINT

and county prosecutors. *Id.* § 22678(b)

63.     Taking up Governor Newsom's call, California Attorney General Rob Bonta has repeatedly pressured social media companies to censor speech. On October 13, 2021, Attorney General Bonta joined with thirteen other state attorneys in asking Facebook why specific accounts had not been suspended for spreading "disinformation" and "misinformation." Letter from William Tong, Attorney General of Connecticut, to Mark Zuckerberg, Chief Executive Officer, Facebook, Inc., Oct. 13, 2021, https://oag.ca.gov/system/files/attachments/press-docs/Facebook%20XCheck%20Letter%20Final%20Signed-Oct%2013%202021.pdf. In the letter, Attorney General Bonta and his colleagues inquired as to "[w]hy has Facebook failed to remove Robert F. Kennedy Jr.'s page after removing his Instagram account?" *Id.* at 2. In a press release, Attorney General Bonta added, "Facebook shouldn't be giving certain users a free pass to spread misinformation." Attorney General Bonta: Facebook Must Provide Answers on 'XCheck' Program and Its Role in Protecting False and Misleading Information About COVID Vaccines on Its Platforms, Oct. 13, 2021, https://oag.ca.gov/news/press-releases/attorney-general-bonta-facebook-must-provide-answers-xcheck-program-and-its-role. All this is in addition to the pressure Attorney General Bonta placed on social media platforms in the run-up to the 2022 election, which have already been described above.

64.     Comments from AB 587's civic supporters provide additional evidence of the bill's censorship design. The Anti-Defamation League or the ADL appears to have had formal involvement in crafting the legislation. It is listed as the sole "Source" of the August 15, 2022 and August 26, 2022 Senate Floor Analyses of AB 587—apparently suggesting core legislative functions were outsourced to the organization. The August 26 analysis states, "This bill is sponsored by the Anti-Defamation League," which is distinguishable from other organizations that the analysis merely lists as "supporting" the bill.

65.     The ADL serves as a third-party partner with social networks such as Facebook, Google, Microsoft, and Twitter to counter the perceived problem of hate speech on social media. ADL, Facebook, Google, Microsoft, Twitter, and ADL Announce Lab to Engineer New Solutions to Stop Cyberhate, Oct. 10, 2017, https://www.adl.org/resources/press-release/facebook-google-microsoft-

twitter-and-adl-announce-lab-engineer-new. At the same time, it has served to promote increased levels of content moderation, including pressuring companies to ban more users on viewpoints through boycotts such as leading the #StopHateForProfit campaign. ADL, *An Open Letter to the Companies that Advertise on Facebook*, June 25, 2020, https://www.adl.org/resources/letter/open-letter-companies-advertise-facebook.

66.    The #StopHateForProfit campaign demanded both increases in content moderation, but also increased "transparency" of moderation to enforce these claims—specifically a: "regular, third party, independent audits of identity-based hate and misinformation with summary results published on a publicly accessible website. We simply can no longer trust Facebook's own claims on what they are or are not doing. A 'transparency report' is only as good as its author is independent." Statement on Stop Hate for Profit on Meeting with Facebook, July 7, 2020, https://naacp.org/articles/statement-stop-hate-profit-meeting-facebook.

67.    AB 587's requirement specifically for transparency about content "flagged by civil society partners" appears specifically aimed to assist such groups in pressuring large tech companies to increase censorship. The requirement to make such reports public also furthers these ends. Cal. Bus. & Prof. Code § 22677(c).

**III.    AB 587's Effects on Plaintiffs**

> **A.    AB 587 will chill speech across all social media platforms, entrenching censorious industry standards.**

68.    AB 587 "shall not apply to a social media company that generated less than one hundred million dollars ($100,000,000) in gross revenue during the preceding calendar year." Cal. Bus. & Prof. Code § 22680. It is unclear from the text of the statute whether a parent company or any other entity that operates a social media platform which obtains $100 million in annual revenues would be subject to AB 587, even if those revenues are unrelated to social media.

69.    Assemblymember Gabriel's statement in the legislative analysis cites the alleged link of unmoderated speech on the social network Gab to acts of violence. Cal. Assembly Comm. On Privacy and Consumer Protection, Apr. 22, 2021, at 4, *available at* https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202120220AB587. But Gab has

ENVISAGE LAW

1  under a hundred million dollars of revenue each year. This shows an express desire for the law to affect

2  smaller social media sites.

3      70.    Even so, AB 587 will chill expression of smaller social networks such as Minds, even if

4  they do not need to submit reports to the Attorney General or create state-sanctioned terms of service.

5  The law requires all large firms to set and extend standards on free speech, ensuring that Minds and

6  other less moderated platforms are outliers.

7      71.    Generally speaking "dominant firms may be involved in setting industry standards."

8  Timothy J. Muris, The FTC and the Law of Monopolization, 67 Antitrust L.J. 693, 723 (2000). This is

9  true among social networks.  The largest online platforms are involved in numerous organizations which

10 informally set best practices for content moderation.

11     72.    The Computer and Communications Industry Association (CCIA), which represents

12 Meta, Google, Apple, Yahoo, and Amazon has repeatedly expressed the need to stop "disinformation"

13 and "hate speech." *See, e.g.*, Computer and Comm'ns Indus. Assoc., *Safeguarding media independence*

14 *and pluralism*, at 1 (Dec. 2022) ("While online platforms make it easy for users to discover media

15 content, the Internet can also be abused by malicious actors to spread disinformation under the pretence

16 of sharing news. In order to address this major challenge, online platforms have put in place a wide

17 variety of initiatives and measures. The fight against the spread of disinformation is a key priority for all

18 of them.").

19     73.    The group Netchoice represents Facebook, Google, Twitter, and TikTok. In a press

20 release related to other social media laws, it noted how its members wish to moderate "medical

21 misinformation, hate speech and slurs (spanning the spectrum from race and religion to veteran status),

22 glorification of violence and animal abuse, and impersonation, lies, and misinformation more broadly."

23 Big Tech Sues Texas Over New Law Targeting Social Media Censorship, Sept. 24, 2021,

24 https://netchoice.org/big-tech-sues-texas-over-new-law-targeting-social-media-censorship/.

25     74.    Google/YouTube, Twitter, Meta, and Microsoft are all members of the Trusted News

26 Initiative, whose mission is to tackle harmful disinformation. The Trusted News Initiative has forums

27 with representatives from these companies on topics such as "Big tech's part in the fight." BBC, *Beyond*

28 *Fake News*, https://www.bbc.co.uk/beyondfakenews/trusted-news-initiative/big-tech/. While these

ENVISAGE LAW

1    organizations do not impose formal regulations, these companies have significant market power, which

2    allows their practices to establish industry standards.

3         75.      The State of the California is a co-plaintiff against Facebook in an antitrust case, which

4    claims that Facebook's "lack of competitive constraint" has prevented advertisers "concerned with a

5    proliferation of misinformation and violent or otherwise objectionable content on Facebook's

6    properties" from influencing Facebook's content moderation policies. *New York v. Facebook, Inc.*, Case

7    No. 20-3589, (D.D.C), ECF No. 1, ¶ 254, *available at*

8    https://oag.ca.gov/sites/default/files/Facebook%20Complaint.pdf.

9         76.      Whether or not California's allegations about Facebook's market power are correct, the

10    collective market power of the dominant firms will help set standards for advertisers and app stores.

11         77.      By coercing larger social networks into enacting viewpoint discriminatory terms of

12    service, they entrench industry standards which make less moderated platforms such as Minds outliers.

13    This, in turn, makes it more likely that advertisers and app store platforms will not do business with

14    Minds.

15         78.      Minds and other smaller social networks still rely on larger online platforms. These

16    networks' apps are hosted by Google's Play Store and the Apple App Store. Both Google and Apple

17    have content moderation policies for their apps, which include prohibitions on content.

18         79.      Google Play requires apps with user-generated content to "[d]efine[] objectionable

19    content and behaviors (in a way that complies with Google Play Developer Program Policies), and

20    prohibits them in the app's terms of use or user policies." Google, User-generated content,

21    https://support.google.com/googleplay/android-developer/answer/9876937?hl=en.

22         80.      Apple similarly has User Generated Content rules requiring a "method for filtering

23    objectionable material from being posted to the app," and a "mechanism to report offensive content and

24    timely responses to concerns." Apple, App Store Review Guidelines, https://developer.apple.com/app-

25    store/review/guidelines/.

26         81.      While it is not clear whether the whole of the Google and Apple app stores are covered

27    by AB 587, aspects of them such as the review and comment sections in the app stores are likely

28    covered as they allow users to "[c]reate or post content viewable by other users, including, but not

COMPLAINT

ENVISAGE LAW

1  limited to, on message boards, in chat rooms, or through a landing page or main feed that presents the

2  user with content generated by other users." Cal. Bus. & Prof. Code § 22675(e)(2)(C).

3      82.    Both Google and Apple have banned, suspended, or not approved social media apps for

4  insufficient levels of content moderation for "hate speech" and "disinformation." Google banned the

5  platform Gab in 2017 and Apple never approved it due its failure to moderate hate speech. Both Google

6  and Apple banned (and later reinstated) the app Parler after the riots on January 6, 2021, effectively

7  destroying its then growing business due to its supposed failure to moderate "disinformation" and

8  "extremism." Google temporarily refused to approve the social media app Truth Social due to content

9  moderation concerns.

10     83.    Google and Apple are both covered by AB 587, at least in functions such as Google

11  Maps and YouTube and Apple Podcasts.

12     84.    When testifying before Congress on December 12, 2021, the ADL endorsed AB 587 as a

13  model to address the perceived problem of both "mainstream social media platforms (Twitter, Facebook,

14  YouTube)" and "fringe platforms (Parler, Telegram, 4chan/8kun)" for allowing "[h]atemongers and

15  extremists spread disinformation to harm targets and terrorize vulnerable communities; they amplify

16  conspiracy theories to advance political aims; radicalize followers; and incite violence either

17  intentionally as a tool to meet their goal or as a predictable outcome." Jonathan Greenblatt, ADL,

18  Congressional Testimony, Holding Big Tech Accountable: Legislation to Build a Safer Internet, H.

19  Comm. On Energy and Commerce Sub. Comm. on Consumer Protection and Commerce, at 21, Dec. 9,

20  2021, https://www.adl.org/sites/default/files/adl-testimony-house-cmte-energy-commerce-holding-big-

21  tech-accountable-2021-12-09.pdf

22     85.    As a direct and proximate result of AB 587, Minds' less moderated terms and the

23  platform's commitment to free speech make it a pariah which can lead to increased censorship from app

24  stores or harms from advertisers. As described above, that is not a bug in AB 587's design, it is a

25  feature.

26     **B.    AB 587 is compatible with Minds' business model and will stifle civil**
         **dialogue and incite social media platforms to censor Minds.**

27

28     86.    Minds' current content moderation would violate AB 587. Minds' current content

moderation policy does not have any regulation of the eight categories of speech identified in AB 587. Rather Minds bans content which is

- Illegal (terrorism, paedophilia, extortion, fraud, revenge porn, sex trafficking)
- Personal and confidential information (doxxing)
- Malware
- Impersonation
- Incites a true threat of violence.

Minds, Content Policy, https://www.minds.com/content-policy. In addition, Minds has policies which address spam and harassment. However, none of these policies are dependent upon whether the harassment, spam, incitement, or other violation is connected to another's race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, gender identity or gender expression. *See id.*

87.    For Minds, this means that, even if the company could decipher AB 587's vague and ambiguous terms, Minds could not produce a report for Attorney General Bonta on the requisite categories. Given the punitive civil penalties available under AB 587, the social network could not operate without risking tens of millions of dollars in liability, which would effectively shutter Minds' platform.

88.    Currently, Minds' annual revenues are under AB 587's $100 million threshold. But the statute still stunts Minds' business model. Like other emerging businesses, Minds wants to grow its business by seeking capital from outside investors. AB 587 limits the company's growth, setting a $100 million artificial ceiling. At the same time, Minds is blocked from being the target of any strategic acquirer with $100 million or more in annual revenues, another barrier to Minds' ability to chart its own future.

89.    AB 587 is not only an impediment to Minds' operation. The statute also undermines the very dialogue the company seeks to foster. Minds is cognizant of the problems that radicalization and hate can cause but believes that censorship exacerbates these problems. In 2021, it launched the "Change Minds" Initiative and white paper "The Censorship Effect." One of the primary authors of the paper was Jesse Morton, who died shortly after the paper's publication, and had been a researcher for the Institute for Strategic Dialogue's Against Violent Extremism Network in North America.

ENVISAGE LAW

90.     Minds argues that its goal is to create a framework which "allows everyone to exchange and debate ideas civilly and encourage other social media platforms to adopt this framework and join in our mission to reduce polarization, increase access to information and build a more healthy society." Minds CEO Bill Ottman explained the company's approach to deradicalization and censorship this way, criticizing the censorship policies of larger platforms: "Well, they're not going to be able to find anything because their rate of de-radicalization is essentially non-existent, because they just throw the people off the platform and don't engage at all. So how are they going to de-radicalize anybody?" John Koetsier, *Does social media censorship cause extremism?*, May 4, 2022, https://johnkoetsier.com/does-social-media-censorship-cause-extremism/.

91.     The Censorship Effect further argues that increased censorship of dominant social networks perversely forced radicals into ideological ghettos such as 8chan:

> In cases where there is no opposing feedback to moderate extreme views that come from this renewed feverish interest, echo chambers can breed stronger views with more intense engagement. In other words, the centralized censorship mechanisms which amplify their member's certainty about their beliefs and lessen their openness to alternative views or the people who hold them can combine with the so-called Streisand Effect to further exacerbate tendencies toward extremism.

In other words, Minds believes that censorship encourages bad behavior on what AB 587's "sponsor" and legislative "source" the ADL calls "fringe platforms."

92.     Support for Minds' position comes from an unlikely source: Governor Gavin Newsom. Governor Newsom once complained about what he called an information "Filter Bubble." Recounting his time as an entrepreneur in the wine industry, Governor Newsom wrote that his company, Plumpjack, "wanted people to make up their own minds and not be influenced by the so-called experts." Gavin Newsom, *supra*, at 36. "By giving them information in an unfiltered way, we wanted to empower them," he wrote. *Id.*

93.     Like Minds, Governor Newsom once applied the same principles to political speech. "On any given day, if you get your opinions from one source and not the other, you're getting only half the story," Governor Newsom wrote. He continued:

> You'll be getting fed one point of view, not developing your own based on competing information. And you'll be missing out on the whole spectrum of what's out there.

> Many people choose to rely on just one side for their information. That's their prerogative. But even those who *do* want to hear all sides are now being denied the opportunity—by Google, Facebook, and other search and social-media sites. And we don't even realize it. The dirty little secret is that each of us perched in the middle of something called the Filter Bubble.

*Id.* at 36-37.

94.     It precisely for the purpose of breaking down the Filter Bubble, and for taking on the dominant firms Governor Newsom identified in his 2013 book, that Minds exists. Nevertheless, AB 587 creates an environment where Minds' lack of content moderation policies put it at odds with the state-mandated industry standards created by the law. These standards are explicitly designed to chill speech and marginalize free speech platforms.

95.     Plaintiffs Tim Pool and The Babylon Bee also break the Filter Bubble. Tim Pool is popular across many social networks, most notably on Facebook, Twitter, and YouTube. Pool regularly features guests from across the ideological spectrum. Despite that, various organizations have frequently pressured YouTube and Twitter to ban him from the platform. For example, the Southern Poverty Law Center, citing the Institute for Strategic Dialogue, has accused Pool and the "superchatters," YouTube users who pay to make highlighted comments on Pool's shows, of "spreading COVID-19 disinformation and making racist commentary" on his show, and then contacted YouTube with the obvious intent to encourage banning his content. Michael Edison Hayden, Southern Poverty Law Center, *Youtube Profiting from Timcast IRL, Study Finds*, May 5, 2022, https://www.splcenter.org/hatewatch/2022/05/05/youtube-profiting-timcast-irl-study-finds.

96.     Meanwhile, The Babylon Bee suffered one of the most infamous suspensions in social media history when Twitter suspended the satire website's account after it published a tweet regarding Admiral Rachel Levine. Ariel Zilber, *Twitter suspends Babylon Bee for naming Rachel Levine 'Man of the Year'*, N.Y. Post, Mar. 21, 2022, https://nypost.com/2022/03/21/twitter-suspends-babylon-bee-over-rachel-levine-man-of-the-year-title/. Twitter locked The Bee out of its account unless and until the company signed an admission that it violated the company's hateful conduct policy. Because The Bee declined Twitter's Orwellian invitation, the satire website's suspension lasted for nearly eight months, until the account was reinstated in November 2022. The Bee's suspension is widely credited with galvanizing Elon Musk's acquisition of Twitter in 2022. The Bee maintains more than 6.8 million

followers across Twitter, Facebook, Instagram, and YouTube, but the site remains a target for critics who claim the website traffics in hate speech, misinformation, and disinformation. *See* Bach, *supra*.

97.     Hate speech, disinformation, and misinformation fall squarely within AB 587 by the statute's own express terms. The law will cause social media companies to censor both Pool and The Bee's speech. The Senate Floor Analysis of AB 587 notes that supporters of the law argued that "[a]dditional transparency is needed . . . so that researchers, civil society leaders, and policymakers can determine the best means to address this growing threat to our democracy." The "growing threat to our democracy" undoubtedly refers to "proliferation of hate speech and misinformation." Groups such as the Southern Poverty Law Center and Institute for Strategic Dialogue are undoubtedly the types of "civil society" and "researchers" AB 587's advocates wanted the law to assist.

98.     In fact, HB 587 refers to "[h]ow the content was flagged, including. . .flagged by civil society partners" and "[h]ow the content was actioned, including. . . actioned by civil society partners" Cal. Bus. & Prof. Code § 22677(a)(V)(B).

99.     So long as they do not engage, tortious interference, defamation, threats, or other unprotected speech or conduct, advocacy groups like the Southern Poverty Law Center are fully within their rights to advocate that social networks deplatform Tim Pool, The Babylon Bee, or anyone else. However, the state cannot selectively target certain viewpoints for "transparency" to assist ideologically aligned pressure groups in their efforts to deplatform it—in the ADL's words, to prevent lack of "transparency" as serving as a "deterrent from making changes, exceptions, or other decisions that end up amplifying hate."

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the First Amendment
### Facial and As-Applied Challenge to AB 587

100.     Plaintiffs reallege the foregoing paragraphs.

101.     California's AB 587 is written with the express intent to discourage expression of constitutionally protected viewpoints which may subjectively be deemed as "hate speech," "racism," "extremism," and "misinformation," and "disinformation."

102.     This type of speech is protected by the First Amendment. *See Matal v. Tam*, 137 S. Ct.

26

COMPLAINT

1744, 1749 (2017) ("Giving offense is a viewpoint. The public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.") (internal quotations omitted).

103.    AB 587's regulation of speech is content and viewpoint based. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). ("Speech regulation is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."). Further, AB 587 "burdens disfavored speech by disfavored speakers." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011).

104.    "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163.

105.    "The First Amendment provides even stronger protection against viewpoint discrimination, which is an egregious form of content discrimination and occurs when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction on speech." *TGP Commc'ns, LLC v. Sellers*, No. 22-16826, 2022 WL 17484331, at *4 (9th Cir. Dec. 5, 2022) (internal quotations and citations omitted). Viewpoint-based discrimination is also "presumptively unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995).

106.    The government's sole justification for the law relates to claimed indirect negative influences—such alleged indirect connections with speech and leading to "radicalization" or that it is a vague "threat to our democracy." Rather than claim that it seeks to regulate directly inciting speech, it cites correlational studies suggesting an indirect link to violence. *See Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 680 (1996) (holding that "the government has no legitimate interest in repressing" any "viewpoints on matters of public concern"); *Volokh v. James*, No. 22-CV-10195 (ALC), 2023 WL 1991435, at *10 (S.D.N.Y. Feb. 14, 2023) ("Even though [New York's Gen. Bus. Law § 394-ccc(1)(a), which also mandated disclosures of content moderation policy,] does not require social media networks to remove 'hateful conduct' from their websites and does not impose liability on users for engaging in 'hateful conduct', the state's targeting and singling out of this type of speech for special measures certainly could make social media users wary about the types of speech they feel free to engage in without facing consequences from the state.").

27

COMPLAINT

ENVISAGE LAW

107.    The disclosure requirements will also threaten the anonymity of users, which threatens their ability to speak and interact with Plaintiffs. Compelled disclosure can also infringe First Amendment rights when the disclosure requirement is itself a form of harassment intended to chill protected expression. Broad disclosure requirements "create an unnecessary risk of chilling in violation of the First Amendment." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2388 (2021) (internal quotation marks omitted); *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 35 (1995) ("Anonymity is a shield from the tyranny of the majority.").

108.    As a direct and proximate result of AB 587, Plaintiffs Pool and The Babylon Bee will be more likely to have their content moderated and censored based on viewpoint.

109.    As a direct and proximate result of AB 587, Plaintiff Minds faces an artificial ceiling on the company's ability to grow its social network and raise capital all while the law casts the platform, which is committed to free speech, as an outlier in the social media industry.

110.    As a direct and proximate result of AB 587, all Plaintiffs have suffered irreparable harm due to restrictions on their free speech rights. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

**COUNT II**
**Violation of the First Amendment**
**Overbreadth Challenge to AB 587**

111.    Plaintiffs reallege the foregoing paragraphs.

112.    AB 587 regulates "hate speech," "racism," "extremism," and "misinformation," and "disinformation." On its face, this type of speech is not "purely factual and uncontroversial" and is related to "heated political controversy," and not merely commercial speech. *CTIA - The Wireless Ass'n v. City of Berkeley, California*, 928 F.3d 832, 845 (9th Cir. 2019) (citing *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985)); *see also Volokh*, 2023 WL 1991435, at *7 (holding that a "requirement that Plaintiffs publish their policies explaining how they intend to respond to hateful content on their website" is not "purely factual and uncontroversial").

113.    AB 587 is overbroad in that its reach extends to a variety of legal, constitutionally protected speech.

28

COMPLAINT

114.    AB 587 does not have any legitimate sweep because its unconstitutional applications outweigh the limited number of applications to cases of speech which fall outside the scope of the First Amendment.

115.    As a direct and proximate result of AB 587, Plaintiffs will suffer ongoing irreparable injuries related to the right to speak and publish protected speech.

**COUNT III**
**Violation of the Fourteenth Amendment**
**Vagueness Challenge to AB 587**

116.    Plaintiffs reallege the foregoing paragraphs.

117.    The Fourteenth Amendment prohibits state laws that either do not contain enough specificity and direction for a person of ordinary intelligence to know what is required or do not provide explicit standards.

118.    AB 587 includes numerous broad, vague, and ambiguous terms, including but not limited to by definitions of terms like "hate speech," "racism," "extremism," "radicalization," "disinformation," "misinformation," and "foreign political interference."

119.    AB 587 contains no explicit standards for what any of these terms mean.

120.    AB 587 is void for vagueness.

121.    As a direct and proximate result of AB 587, because of the vagueness of the statute, Plaintiffs will suffer ongoing irreparable injuries related to the right to speak and publish protected speech.

**COUNT IV**
**Violation of Article I, Section 2 of the California Constitution**

122.    Plaintiffs reallege the foregoing paragraphs.

123.    Article I, section 2 of the California State Constitution provides that "[e]very person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

124.    "As a general rule, however, article I's free speech clause and its right to freedom of speech are not only as broad and as great as the First Amendment's, they are even 'broader' and 'greater.'" *Gerawan Farming, Inc. v. Lyons*, 24 Cal. 4th 468, 491 (2000) (internal citations omitted).

29

ENVISAGE LAW

125.    This broader interpretation reading applies to commercial speech, beyond a First Amendment "right against prior restraint could prove empty without a right against subsequent punishment, inasmuch as subsequent punishment might cause the speaker to impose a "prior restraint," as it were, on himself, totally apart from even the threat of imposition of any prior restraint." *Id.* at 514.

126.    AB 587 violates the guarantees of free speech provided for in the California Constitution.

127.    As a direct and proximate result of AB 587, Plaintiffs will suffer ongoing irreparable injuries related to the right to speak and publish protected speech.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully prays that this Court:

A.    Enters a declaration that AB 587 is unconstitutional on its face and as applied to Plaintiffs under the First Amendment, the Fourteenth Amendment, and the California Constitution;

B.    Enters an order preliminarily and permanently enjoining Attorney General Bonta from enforcing AB 587;

C.    An award of attorney's fees under 42 U.S.C. § 1988 and any other applicable laws; and

D.    Award any other relief to Plaintiffs which this Court deems necessary and proper.

Dated April 11, 2023                    ENVISAGE LAW
                                        CHARIS LEX P.C.


                                        By:    */s/ James R. Lawrence, III*
                                               James R. Lawrence, III

                                        *Attorneys for Plaintiffs Minds, Inc.,*
                                        *Tim Pool, and The Babylon Bee LLC*

ENVISAGE LAW

30
COMPLAINT