1  ROB BONTA
   Attorney General of California
2  PAUL STEIN
   Supervising Deputy Attorney General
3  SHARON L. O'GRADY
   Deputy Attorney General
4  State Bar No. 102356
     455 Golden Gate Avenue, Suite 11000
5    San Francisco, CA  94102-7004
     Telephone:  (415) 510-3834
6    Fax:  (415) 703-1234
     E-mail:  Sharon.OGrady@doj.ca.gov
7  *Attorneys for Defendant*

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                           WESTERN DIVISION

11

12

13  **MINDS, INC., ET AL,**                    2:23-cv-02705- RGK-MAAx

14                           Plaintiffs,       **MEMORANDUM IN SUPPORT OF
                                               DEFENDANT'S MOTION TO**
15       **v.**                                **DISMISS**

16  **ROBERT BONTA,**                          Date:        June 19, 2023
                                               Time:        9:00 a.m.
17                           Defendant.        Courtroom:   10B
                                               Judge:       The Honorable R. Gary
18                                                           Klausner
                                               Trial Date:  None set
19                                             Action Filed: April 13, 2023

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction .................................................................................1

Background....................................................................................2

    I.    Assembly Bill 587 ..............................................................2

    II.    The Allegations of the Complaint ......................................5

        A.    Count I: Violation of the First Amendment...........................6

        B.    Count II: Unconstitutional Overbreadth ...............................6

        C.    Count III: Unconstitutional Vagueness ...................................6

        D.    Count IV: Violation of California Constitution, Article I,
            Section 2. .........................................................................7

Legal standard...............................................................................7

Argument .....................................................................................8

    I.    Plaintiffs Lack Standing and Their Claims Are Not Ripe. ................8

    II.    Plaintiffs' First Amendment Claim Fails........................................10

        A.    The Disclosures Required by AB 587 Are Factual and
            Uncontroversial................................................................11

        B.    AB 587 Is Reasonably Related to a Substantial State
            Interest..............................................................................12

        C.    The Complaint Fails to Allege Facts That Would Support
            a Finding That AB 587 Is Unduly Burdensome. ...................16

    III.    Plaintiffs' Overbreadth Claim Fails................................................16

    IV.    Plaintiffs' Vagueness Claim Fails, ................................................17

    V.    The Complaint Fails to State a Claim under the California
       Constitution. ....................................................................................18

        A.    Plaintiffs' State Law Claim Is Barred by the Eleventh
            Amendment. .....................................................................19

        B.    Plaintiffs' Claim Under the California Constitution Fails
            for the Same Reasons Their First Amendment Claim
            Fails..................................................................................19

    VI.    Leave to Amend Should be Denied.................................................20

Conclusion...................................................................................20

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Agua Caliente Band of Cahuilla Indians v. Hardin*
    223 F.3d 1041 (9th Cir. 2000).................................................................19

*Am. Fuel & Petrochem. Mfrs. v. O'Keefe*
    903 F.3d 903 (9th Cir. 2018)...................................................................15

*Am. Hosp. Ass'n v. Azar*
    983 F.3d 528 (D.C. Cir. 2020) ................................................................13

*Am. Meat Inst. v. U.S. Dept. of Agric.*
    760 F.3d 18 (D.C. Cir. 2014) (en banc)..................................................16

*Ashcroft v. Iqbal*
    556 U.S. 662 (2009)..................................................................................7

*Beeman v. Anthem Prescription Mgmt., LLC*
    165 Cal. Rptr. 3d 800 (Cal. 2013) .....................................................19, 20

*Bell Atlantic Corp. v. Twombly*
    550 U.S. 544 (2007)..................................................................................7

*Boutilier v. Immigr. & Naturalization Serv.*
    387 U.S. 118 (1967)................................................................................18

*CTIA – Wireless Assn. v. City of Berkeley*
    928 F.3d 832 (9th Cir. 2019)........................................................11, 12, 16

*Daniels-Hall v. Nat'l Educ. Ass'n*
    629 F.3d 992 (9th Cir. 2010)....................................................................7

*Doe v. Regents of Univ. of Cal.*
    891 F.3d 1147 (9th Cir. 2018)................................................................19

*Envtl. Defense Ctr. v. U.S. E.P.A.*
    344 F.3d 832 (9th Cir. 2003)..................................................................11

*Foti v. City of Menlo Park*
    146 F.3d 629 (9th Cir. 1998)..................................................................16

ii

1
2

# TABLE OF AUTHORITIES
## (continued)

**Page**

3
4

*French v. Jones*
876 F.3d 1228 (9th Cir. 2017)......................................................................17

5
6

*In re Gilead Scis. Sec. Litig.*
536 F.3d 1049 (9th Cir. 2008)........................................................................7

7
8

*Informed Consent Action Network v. YouTube, Inc.*
582 F. Supp. 3d (N.D. Cal. 2022)..................................................................2

9
10

*Italian Colors Rest. v. Becerra*
878 F.3d 1165 (9th Cir. 2018)........................................................................8

11

*King v. Facebook, Inc.*
572 F. Supp. 3d 776 (N.D. Cal. 2021)...........................................................2

12
13

*Knox v. Brovich*
907 F.3d 1167 (9th Cir. 2018)......................................................................16

14
15

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*
416 F.3d 940 (9th Cir. 2005).................................................................8, 20

16
17

*Milavetz, Gallop & Milavetz v. United States*
559 U.S. 229 (2010)......................................................................................11

18
19

*Murphy v. Twitter, Inc*
274 Cal. Rptr. 3d 360 (Ca1. Ct. App. 2021) .................................................2

20
21

*Nat'l Elec. Mfrs. Assn. v. Sorrell*
272 F.3d 104 (2d Cir. 2011)...................................................................13, 16

22
23

*Nationwide Biweekly Admin. v. Owen*
873 F.3d 716 (9th Cir. 2017)........................................................................11

24

*Navarro v. Block*
250 F.3d 729 (9th Cir. 2001)..........................................................................7

25
26

*NetChoice, LLC v. Att'y Gen.*
34 F.4th 1196 (11th Cir. 2022)...................................2, 9, 13, 14, 15

27
28

*NetChoice, LLC v. Paxton*
49 F.4th 439 (5th Cir. 2022).................................................................2, 14

**TABLE OF AUTHORITIES**
(continued)

Page

*Noori v. Countrywide Payroll & HR Solutions, Inc.*
  257 Cal. Rptr. 3d 102 (Cal. Ct. App. 2019)......................................................15

*O'Handley v. Padilla*
  579 F. Supp. 3d 1163 ..............................................................................2, 17, 18

*O'Handley v. Weber*
  62 F.4th (9th Cir. 2023) ...............................................................................17, 18

*Pennhurst State Sch. & Hosp. v. Halderman*
  465 U.S. 89 (1984)...........................................................................................19

*Perry v. Newsom*
  18 F.4th 622 (9th Cir. 2021)...............................................................................7

*Texas v. United States*
  523 U.S. 296 (1998)...........................................................................................8

*Thomas v. Anchorage Equal Rights Comm'n*
  220 F.3d 1354 (9th Cir. 2000)............................................................................8

*Thomas v. Anchorage Equal Rights Comm'n*
  220 F.3d at 1138 ...............................................................................................8

*United States v. O'Brien*
  391 U.S. 367 (1968)..........................................................................................15

*United States v. Sineneng-Smith*
  140 S. Ct. 1575 (2020)......................................................................................16

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*
  455 U.S. 489 (1982)..........................................................................................18

*Wolfson v. Brammer*
  616 F.3d 1045 (9th Cir. 2010)............................................................................8

*Ex parte Young*
  209 U.S. 123 (1908)..........................................................................................19

1

2

# TABLE OF AUTHORITIES
## (continued)

**Page**

3

*Yuksel v. Twitter, Inc.*

4   No. 22-cv-05415-TSH, 2022 WL 16748612 (N.D. Cal. Nov. 7,

   2022) ......................................................................................................2

5

6   *Zauderer v. Office of Disciplinary Counsel*

   471 U.S. 626 (1985).......................................................... 11, 12, 16

7

8

**STATUTES**

9

United States Code

   18 § 2251 .............................................................................................17

10   47 § 230(c)(2)(A) .............................................................................10

11

California Business and Professions Codes

12   § 22675 ..................................................................................................3

   § 22675(d) ............................................................................................3

13   § 22675(e) .............................................................................................3

   § 22675-81 ............................................................................................4

14   § 22676(a) .......................................................................................3, 12

   § 22676(a)(5) ........................................................................................4

15   § 22676(b) .............................................................................................3

   § 22676(c) .............................................................................................4

16   § 22677(a) .............................................................................................3

   § 22677(a)(1) ..................................................................................3, 12

17   § 22677(a)(3) ...................................................................... 4, 12, 17, 18

   § 22677(a)(4) .........................................................................................3

18   § 22677(a)(4)(A) ...................................................................................4

   § 22677 (a)(5)(B)(iv)-(v) ......................................................................4

19   § 22677(b) .............................................................................................3

20   § 22678 ................................................................................................12

   § 22680 ..............................................................................................4, 8

21   § 22681 .............................................................................................3, 4

22

23

24

25

26   California Penal Code

   § 311-311.12 .......................................................................................17

27

28

v

# TABLE OF AUTHORITIES
### (continued)

**Page**

**CONSTITUTIONAL PROVISIONS**

California Constitution
    Article I, § 2 ............................................................................................7, 20

United States Constitution
    First Amendment ...................................................................................*passim*
    Eleventh Amendment...........................................................................2, 19
    Article III ..........................................................................................1, 8, 10

**COURT RULES**

Federal Rule of Civil Procedure
    12(b)(1)...................................................................................................7
    12(b)(6)...................................................................................................7

**OTHER AUTHORITIES**

Assembly Bill 587
    (2022 Cal. Stats., ch. 269)..................................................................*passim*
    2021-22 Sess. (June 23, 2022) ........................................................14
    2021-22 Sess. (Aug. 11, 2022).........................................................14
    2021-22 Sess. (April 21, 2021) ........................................................14

**INTRODUCTION**

Plaintiffs challenge Assembly Bill 587, a straightforward disclosure statute that requires social media companies with annual gross revenues of at least $100 million to publicly disclose information about their content-moderation policies and decisions, i.e., whether and how they take action against content and users that violate their terms of service.  The statute is intended to provide transparency to California consumers.  Notwithstanding Plaintiffs' hyperbole, the statute does not dictate either the substantive content of any platform's terms of service or the manner in which those terms must be enforced.  The case should be dismissed without leave to amend.

Preliminarily, Plaintiffs' Complaint fails to allege a case or controversy under Article III of the Constitution.  None of the Plaintiffs is even required to make disclosures under the statute. Their only claims of harm are based on speculative and conclusory allegations about the bill's downstream effects on other social media platforms and users who are not subject to its requirements.  Plaintiffs lack standing and their claims are not ripe.

On the merits, Plaintiffs fail to state any claim as a matter of law.  Plaintiffs' First Amendment challenge fails because the statute simply requires that social media companies make purely factual disclosures about their terms of service, a requirement that is constitutionally permissible under longstanding Supreme Court and Ninth Circuit jurisprudence.  Although Plaintiffs claim that AB 587 will make it more likely that social media platforms will "censor" their posts, the Ninth Circuit has made clear that social media platforms are private actors, and that, absent exceptional circumstances not alleged here, the State cannot be held responsible for their content-moderation decisions.

Plaintiffs' constitutional overbreadth and vagueness claims fail as a matter of law for the same reasons.  AB 587 does not regulate what users may say on social media, or what social media platforms can or must do to moderate content that they

deem harmful or otherwise inappropriate under their own policies.  It simply requires social media companies to provide greater transparency about their content-moderation rules and the steps they take to enforce those rules.

Given the failure of Plaintiffs' federal claims, this Court need not exercise supplemental jurisdiction over Plaintiffs' claim under the California Constitution's equivalent to the First Amendment.  Regardless, that claim is squarely barred by the Eleventh Amendment, which prohibits federal suits against state officials based on alleged violations of state law, and it would fail for the same reasons that Plaintiffs' First Amendment claim fails.

The defects in Plaintiffs' Complaint cannot be cured.  The Court should dismiss the Complaint without leave to amend.

# BACKGROUND

## I.   ASSEMBLY BILL 587

Social media platforms, such as Twitter, have terms of service, including content-moderation rules, to which individuals must agree as a condition of using the platform.  *See, e.g.*, *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1172, *aff'd sub nom. O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023).  These rules give the platform the right to take action against content or users that violate the rules.  *Id.* at 1186.  In recent years, content-moderation by social media companies has drawn public concern, with numerous lawsuits filed by users whose accounts were limited or suspended for posting content that violated the platforms' rules.  *See, e.g., Informed Consent Action Network v. YouTube, Inc.*, 582 F. Supp. 3d (N.D. Cal. 2022); *Yuksel v. Twitter, Inc.*, No. 22-cv-05415-TSH, 2022 WL 16748612 (N.D. Cal. Nov. 7, 2022); *King v. Facebook, Inc.*, 572 F. Supp. 3d 776 (N.D. Cal. 2021); *Murphy v. Twitter, Inc*, 274 Cal. Rptr. 3d 360 (Ca1. Ct. App. 2021).  Some states have passed laws prohibiting social media platforms from moderating, restricting, or otherwise limiting particular kinds of content.  *NetChoice, LLC v. Att'y Gen.*, 34 F.4th 1196, 1205-1206 (11th Cir. 2022) (describing Florida statute); *NetChoice,*

*LLC v. Paxton*, 49 F.4th 439, 445-446 (5th Cir. 2022) (describing Texas statute).  In marked contrast, California's recently passed Assembly Bill 587 (2022 Cal. Stats., ch. 269) ("A.B. 587") does not regulate content-moderation policies or decision-making by private social media platforms.  It is simply a disclosure statute.

Codified at California Business and Professions Codes sections 22675-22681,[1] AB 587 provides that, commencing January 1, 2024, social media companies, as defined in the statute,[2] must post the terms of service for each social media platform owned or operated by the company "in a manner reasonably designed to inform all users of the social media platform of the existence and contents of the terms of service." § 22676(a).  The posted terms of service must contain a "description of the process users must follow to flag content, groups, or other users that they believe violate the terms of service," "the social media company's commitments on response and resolution time," and a "list of potential actions the social media company may take against an item of content or a user…." § 22676(b).

The social media companies also must, commencing January 1, 2024, submit to the Attorney General a semi-annual "terms of service report" containing specific factual information.  § 22677(a)-(b).  The reports must include the "current version of the platform's terms of service" and a "detailed description of content moderation practices used by the social media company …." § 22677(a)(1), (a)(4). The reports must also include a statement of "whether the current version of the terms of service define each of the following categories of content, and, if so, the definitions of those categories," and "any existing policies intended to address the categories," which are:  "[h]ate speech or racism"; "[e]xtremism or radicalization"; "[d]isinformation or misinformation"; "[h]arassment"; and "[f]oreign political

---

[1] All statutory citations are to the California Business and Professions Code, unless otherwise indicated.

[2] AB 587 defines "social media company" as a person or entity that owns or operates one or more "social media platforms." § 22675(d).  A "social media platform" is defined as a "public or semi-public internet-based service that has users in California and meets" specific criteria.  § 22675(e).

interference." § 22677(a)(3), (a)(4)(A).  Finally, the reports must include

"information on content that was flagged by the social media company as content

belonging to any of the categories," including the number of items of content that

were "flagged" or "actioned" by the social media company, and how those items of

content were "flagged" of "actioned," e.g., whether by company employees,

artificial intelligence software, or users.  § 22676(a)(5), (a)(5)(B)(iv)-(v).  The

Attorney General is directed to compile all terms of service reports and make them

available to the public in a "searchable repository on its official internet website."

§ 22676(c).

Exempt from the statute are social media companies with annual gross

revenues of less than $100 million.  § 22680.  Also exempt are platforms "for

which interactions between users are limited to direct messages, commercial

transactions, consumer reviews of products, sellers, services, events, or places, or

any combination thereof."  § 22681.

Nothing in AB 587 requires social media companies to disclose the identities

of or information about specific users.  *See* §§ 22675-81.  Nothing in AB 587

dictates the substantive content of social media companies' terms of service.  *See*

§§ 22675-81.  Nothing in AB 587 requires that social media companies take, or

prohibits them from taking, any action whatsoever against any item of content or

user.  *See* §§ 22675-81.  And nothing in AB 587 requires that social media

companies' terms of service define any categories of content.  *See id.*

An Assembly Judiciary Committee Report explained the bill's purposes as

follows:

> In essence, AB 587 is a transparency measure. It would require social
>
> media companies to post their "terms of service," especially as to the
>
> kinds of online behavior and activities they permit and, conversely, what
>
> kinds of behavior and activities subject a user to a temporary or
>
> permanent prohibition from using the social media service. Presumably,

requiring these postings will serve three purposes. First, it will let users know what social media platforms do to flag and remove certain kinds of content, which may affect what sites users prefer to use. Second, it lets users know in advance what kind of content or conduct could lead to their being temporarily or permanently banned from using the social media service. Third, if social media companies are forced to disclose what they do in this regard, it may pressure them to become better corporate citizens by doing more to eliminate hate speech and disinformation.

Cal. Assemb. Comm. on Judiciary Report, 2021-22 Sess. (A.B. 587), Apr. 27, 2022, Request for Judicial Notice filed herewith ("RJN") Exh. 1, Docket entry 15-3.

## II.   THE ALLEGATIONS OF THE COMPLAINT

Plaintiff Minds, Inc. ("Minds") allegedly operates a social networking service. Complaint ¶ 10.  The service can be accessed through Minds' own website or "as an app for Android and iPhone." *Id*.  While Minds has content-moderation rules that ban, *inter alia*, "revenge porn," "doxxing," and "malware," it does not "have any regulation of the eight [sic] categories of speech identified in AB 587." *Id*. ¶ 86. Minds has less than $100 million in annual revenue, *id*. ¶ 88, and thus is exempt from AB 587's requirements.

Plaintiff Tim Pool ("Pool") is a "social media content creator" with millions of followers on various platforms. Complaint ¶ 11.  Pool has been "frequently accuse[d] of creating 'hate speech,' 'disinformation,' and 'extremism'—labels he strongly rejects—often with the explicit intention of pressuring social networks to deplatform him." *Id*. ¶¶ 11, 95.

Plaintiff The Babylon Bee LLC ("The Bee") publishes satirical news articles on its website, which it also posts to Twitter, Facebook, Instagram, and YouTube. *Id*. ¶ 12.  Its satire has been criticized for "draw[ing] on and reinforce[ing]

5

misinformation and conspiracy," and for trafficking in "hate speech, misinformation, and disinformation." *Id*. ¶¶ 12, 96.  In 2022, Twitter suspended The Bee for violating Twitter's hateful conduct policy; the account was restored after Elon Musk purchased Twitter. *Id*. ¶ 96.

Shorn of hyperbole, the claims alleged in the Complaint are as follows:

### A.   Count I: Violation of the First Amendment

The Complaint alleges that AB 587 was "written with the express intent to discourage expression of constitutionally protected viewpoints which may be subjectively deemed as 'hate speech,' 'racism,' 'extremism,' and 'misinformation,' and disinformation.'"  Complaint ¶ 101.  AB 587 allegedly makes it "more likely" that Plaintiffs Pool and Bee will "have their content moderated and censored based on viewpoint." *Id*. ¶ 108.  And it allegedly imposes on Plaintiff Minds "an artificial ceiling on its ability to grow its social network and raise capital all while the law casts the platform, which is committed to free speech, as an outlier in the social media industry." *Id*. ¶ 109.  The Complaint further alleges that AB 587 "threatens the anonymity of users which threatens their ability to speak and interact with plaintiffs." *Id*. ¶ 107.

### B.   Count II: Unconstitutional Overbreadth

The Complaint alleges that AB 587 is overbroad because it "regulates 'hate speech,' 'racism,' 'extremism,' and 'misinformation,' and 'disinformation,'" and thus "extends to a variety of legal, constitutionally protected speech." *Id*. ¶¶ 112-113.  Further, "its unconstitutional applications outweigh the limited number of applications to cases of speech which fall outside the scope of the First Amendment." *Id*. ¶ 114.

### C.   Count III: Unconstitutional Vagueness

The Complaint alleges that AB 587 is unconstitutionally vague because it "includes numerous broad, vague and ambiguous terms," such as "'hate speech,' 'racism,' extremism,' 'radicalization,' 'disinformation,' 'misinformation,' and

'foreign political interference,'" and "contains no explicit standards for what any of these terms mean." *Id.* ¶¶ 118, 119.

### D. Count IV: Violation of California Constitution, Article I, Section 2.

Finally, the Complaint alleges that AB 587 violates Plaintiffs' right to free speech under the California Constitution's free speech equivalent to the First Amendment (Cal. Const., art. I, § 2).  Complaint ¶¶ 123-127.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss a complaint on the basis that there is no subject matter jurisdiction.  In such situations, the party asserting jurisdiction has the burden of proving it exists.  *Perry v. Newsom*, 18 F.4th 622, 630 (9th Cir. 2021).

A complaint may also be dismissed for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  Dismissal is proper where there is no cognizable legal theory or there are insufficient facts alleged to support a cognizable legal theory.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).   To defeat a Rule 12(b)(6) motion, a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A court must assume the plaintiff's allegations of fact are true and draw all reasonable inferences in the plaintiff's favor.  *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).  However, the court is not required to "accept as true allegations that are unwarranted deductions of fact or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  And "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action'" cannot survive a motion to dismiss.  *Id.*

Leave to amend need not be granted if "it is clear that the complaint could not be saved by an amendment." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

## ARGUMENT

### I.   PLAINTIFFS LACK STANDING AND THEIR CLAIMS ARE NOT RIPE.

The Complaint fails to allege a case or controversy under Article III of the Constitution.  To establish standing, Plaintiffs must allege: (1) they suffered an "injury in fact," which is an "actual or imminent" invasion of a legally protected interest that is "concrete and particularized"; (2) the injury must be "fairly traceable" to the challenged conduct of the defendant; and (3) it must be likely that the [plaintiffs'] injury will be redressed by a favorable judicial decision." *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1171 (9th Cir. 2018) (citations omitted). Plaintiffs must "face a realistic danger of sustaining a direct injury as a result of [defendant's] alleged illegal action." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1354, 1139 (9th Cir. 2000).  Where an allegation of injury is conjectural or hypothetical and not clean-cut and concrete, concepts of standing and ripeness overlap.  *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010).  *See Texas v. United States*, 523 U.S. 296, 300 (1998); *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d at 1138.  "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. at 300; *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d at 1138.

Here, Plaintiffs do not allege that they are even subject to the disclosure requirements of AB 587, and they patently are not.  Of the three, only Minds is alleged to operate a social media platform, but it admits that it does not have $100 million in annual revenue; therefore, it is exempt from AB 587's requirements. Complaint ¶¶ 88, 109; *see* § 22680.  Although Minds hopes to "grow its business"

1   and one day reach that threshold, Complaint ¶ 88, that allegation satisfies neither

2   standing nor ripeness.

3       The Complaint also does not plausibly allege any injury-in-fact caused by AB

4   587's regulation of covered social media companies.  Instead, it rests on farfetched

5   allegations about the downstream effects of AB 587.  With respect to Plaintiffs Pool

6   and The Bee, it alleges that "the law will cause social media companies to censor"

7   them (Complaint ¶¶ 94, 97), without citing any provision in the law that actually

8   does that.  Nothing in AB 587 tells social media companies what, if any, content-

9   moderation actions they must take, or requires them to "censor" anyone. *Cf.*

10  *NetChoice, LLC v. Att'y Gen.*, 34 F.4th 1203-05 (challenging Florida statute's

11  content-moderation restrictions on private social media platforms).

12      In similar fashion, the Complaint alleges that by regulating large social media

13  companies, the law will set "industry standards" and thereby ensure that Minds and

14  other "less moderated platforms" will be viewed as "outliers" and "pariahs."  *Id.*

15  ¶¶ 70, 7; *id.* ¶ 94 (alleging that AB 587 "creates an environment where Minds' lack

16  of content moderation policies put it at odds with the state-mandated industry

17  standards created by the law").  This, in turn, will allegedly "limit the company's

18  growth" and at the same time prevent it from "being the target of any strategic

19  acquirer with $100 million or more in annual revenues …."  *Id.* ¶ 88.  Again, this

20  rests on a blatant misreading of AB 587, which does not dictate the terms of any

21  company's content-moderation policy, and does not require any platform to take

22  any particular action with respect to any content or user.  It also rests on pure

23  speculation about future events in the marketplace, and the actions of a host of

24  third-parties that may or may not behave the way Plaintiffs predict, and for reasons

25  that have nothing to do with AB 587.  *See* Complaint ¶ 77 (alleging that AB 587

26  will make it "more likely that advertisers and app store platforms will not do

27  business with Minds".)  Indeed, the Complaint alleges that Google and Apple

28  *already* require social media apps used on iPhone and Android phones to have

content-moderation rules and procedures, and that Google and Apple have "banned, suspended, or not approved social media apps for insufficient levels of content moderation for 'hate speech' and 'disinformation.'" *Id.* at ¶¶ 78-83.  It is apparent that Plaintiffs' real complaint is that other persons and entities have their own free speech rights and have exercised them to criticize Plaintiffs and others for spreading COVID disinformation, racist commentary, and hate speech, and to advocate that they be banned or "deplatformed," none of which activities were triggered by AB 587, which has yet to even go into effect. *Id.*; *see also id.* ¶¶ 85-98.

Social media platforms are statutorily exempt from liability for "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected."  47 U.S.C. § 230(c)(2)(A).  The fact that Apple, Google, or others may (or may not) choose to take action against Plaintiffs does not give Plaintiffs standing to challenge AB 587, which does not impose any obligations on social media platforms to restrict access.  Plaintiffs' speculation that at some future date a social media platform, encouraged somehow by AB 587, may take action against them falls far short of establishing Article III jurisdiction.

## II.   PLAINTIFFS' FIRST AMENDMENT CLAIM FAILS.

As explained, AB 587 does not dictate content-moderation policies or decisions about any particular content or user on social media. It merely requires covered social media companies to post their content-moderation policies and procedures so users can see them, and to report information about their content-moderation policies and decisions to the Attorney General on a semi-annual basis, so he can compile that information and make it available on his official website, enabling consumers to compare different platforms.  Thus, AB 587 does nothing to convert private content-moderation decisions into state action, and Plaintiffs do not and could not allege otherwise.  *See infra* Section III. Rather, AB 587 is in the same

mold as other consumer disclosure statutes, such as food labeling and truth-in-lending laws.  To the extent it regulates speech by covered social media companies, it involves compelled commercial speech of purely factual and uncontroversial information, consistent with the First Amendment.

The standard for compelled disclosures in the context of commercial speech is the test established in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985).  "Under *Zauderer*, compelled disclosure of commercial speech complies with the First Amendment if the disclosure is reasonably related to a substantial governmental interest and is purely factual and uncontroversial." *CTIA – Wireless Assn. v. City of Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019) ("*CTIA*").  *Zauderer* and its progeny reflect the unexceptional principle that "[t]he First Amendment does not generally protect corporations from being required to tell prospective customers the truth." *Nationwide Biweekly Admin. v. Owen*, 873 F.3d 716, 721 (9th Cir. 2017).

## A.   The Disclosures Required by AB 587 Are Factual and Uncontroversial.

Starting with the first part of the *Zauderer* test, the Ninth Circuit has explained that the factual and uncontroversial requirement is satisfied where the law in question does not "attempt[] to 'prescribe what shall be orthodox in politics, nationalism, religion or other matters of opinion, or force citizens to confess by word or act their faith therein.'" *Envtl. Defense Ctr. v. U.S. E.P.A.*, 344 F.3d 832, 849 (9th Cir. 2003).  "Uncontroversial" refers to the "factual accuracy of the compelled disclosure, not its subjective impact on the audience." *CTIA*, 854 F.3d at 1117. *See, e.g.*, *Milavetz, Gallop & Milavetz v. United States*, 559 U.S. 229, 251 (2010) (upholding law requiring that certain bankruptcy lawyers disclose themselves as "debt relief agencies," despite law firm's argument that the term was "confusing and misleading"); *Nat'l Biweekly Admin. v. Owen*, 873 F.3d at 733 (upholding requirement that mortgage refinancing company disclose that its

solicitations were not authorized by the lender); *CTIA*, 928 F.3d at 846-47 (upholding ordinance requiring cell phone retailers to disclose that cell phone use could cause exposure to "RF radiation" in excess of federal safety guidelines, notwithstanding argument that term was "fraught with negative associations").

Here, although the Complaint is littered with conclusory allegations that AB 587 is "viewpoint discriminatory," *see* Complaint ¶¶ 6-8, 77, 99, 101, 103, it fails to identify any provision of the law that requires any disclosure that is not purely factual. AB 587 simply requires that social media companies post their terms of service and specific factual information about those terms of service, § 22676(a), and provide semi-annual reports to the Attorney General that include their current terms of service (§ 22677(a)(1)), as well as related statistical information on "content that was flagged by the social media company as content belonging to any of the categories described in [§ 22677(a)(3)]." § 22678.

AB 587 only requires social media companies to state "*whether* the current version of the terms of service defines each of the following categories of content, and, *if so*, the definitions of those categories, including *any* subcategories." § 22677(a)(3) (italics added). Thus, if a social media company's terms of service do not use the categories listed in AB 587, its report to the Attorney General would simply disclose that fact. Likewise, if a social media company does not moderate— or "flag"—content meeting its own definitions of "hate speech," "misinformation," or the other categories listed in AB 587, it would have no numerical data on that subject to include its report. *See id.* All of the disclosure requirements are purely factual and noncontroversial.

### B. AB 587 Is Reasonably Related to a Substantial State Interest.

AB 587 also meets the second part of the *Zauderer* test, because it is "reasonably related to a substantial governmental interest." *CTIA*, 928 F.3d at 845. California clearly has a substantial interest in requiring social media companies to be transparent about their content-moderation policies and decisions, so consumers

can make informed decisions.  *E.g., Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 540-41

(D.C. Cir. 2020) (upholding statute requiring hospitals to disclose pricing

information, "to achieve goal of informing consumers about a particular product

trait") (quoting *Am. Meat Inst. v. U.S. Dept. of Agric.*, 760 F.3d 18, 26 (D.C. Cir.

2014) (en banc); *Nat'l Elec. Mfrs. Assn. v. Sorrell*, 272 F.3d 104, 115 (2d Cir.

2011) (rejecting challenge to regulation requiring disclosure of information

concerning mercury-containing products "to better inform consumers about the

products they purchase").

   As explained above, the purposes of AB 587 include letting users know

"what social media platforms do to flag and remove certain kinds of content,

which may affect what sites users prefer to use," and "what kind of content or

conduct could lead to their being temporarily or permanently banned from

using the social media service."  *See* RJN, Exh. 1, Docket entry 15-3.  AB 587

directly advances these substantial state interests.  Indeed, courts looking at

similar disclosure requirements in the social media space have expressed no

concern about their constitutionality.  In addition to content-moderation

restrictions, the statute at issue in *NetChoice, LLC v. Att'y Gen.*, 34 F.4th at

1230, contains provisions requiring that social media platforms "publish the

standards, including detailed definitions, it uses or has used for determining

how to censor, deplatform, and shadow ban," and that they inform users about

changes to their terms of service before implementing them.  *Id.*  On an appeal

from an order granting a preliminary injunction, the Eleventh Circuit held that

the statute's content-moderation restrictions were likely unconstitutional, but

Florida's interest in requiring social media platforms to publish their content-

mediation standards was likely legitimate, because it ensures that "consumers

who engage in commercial transactions with platforms by providing them with

a user and data for advertising in exchange for access to a forum—are fully

informed about the terms of that transaction and aren't misled about

platforms' content-moderation." *Id*.  Similarly, the Texas statute at issue in

*NetChoice, LLC v. Paxton* contains provisions requiring large social media

platforms to "publish an acceptable use policy and disclose information about

the Platforms' content management and business practices," and publish a

report containing high-level statistics about their content-moderation activities.

49 F.4th at 485.  Despite the law's other problems, there was no dispute that

its disclosure requirements "advance the state's interest in enabling users to

make an informed choice regarding whether to use the Platforms."  49 F.4th at

485 (cleaned up).  Here, AB 587 provides similar transparency and is

constitutional.

　　　As explained, the Legislature also considered that, by requiring greater

transparency about platforms' content-moderation rules and decisions, AB 587 may

encourage—*though not require*—social media companies to "become better

corporate citizens by doing more to eliminate hate speech and disinformation" on

their platforms.  RJN, Exh. 1, Docket entry 15-3. This, too, is a substantial state

interest.[3]  Although Plaintiffs contend the Legislature's "true" purpose was to

---

[3] The Legislature was concerned that "social media has become a powerful and largely unregulated platform for groups espousing hate, violence, bigotry, conspiracy theories and misinformation." RJN, Exh. 1, Docket entry 15-3.  Use of social media has ballooned from only five percent of adults in 2005 to over 70 percent of adults in 2022.  A.B 587 S. Judiciary Comm. Report, 2021-22 Sess. (June 23, 2022), RJN, Exh. 2, Docket entry 15-4.  During that time, social media companies' content-moderation policies have dramatically evolved; at the same time, "proliferation of objectionable content and 'fake news' has led to calls for swifter and more aggressive action in response." *Id*.  The Legislative history notes that a recent study of Twitter posts determined that "more targeted, discriminatory tweets posted in a city related to a higher number of hate crimes." A.B. 587 S. Rules Comm. Rep., 2021-22 Sess. (Aug. 11, 2022), RJN, Exh. 3, Docket entry 15-5; *see* A.B. 587 Assemb. Comm. on Judiciary Rep., 2021-22 Sess. (April 21, 2021), RJN, Exh. 4, Docket entry 15-6.  The Legislature also was concerned that social media companies were deploying a number of methods of content moderation, but there was a lack of transparency into those methods.  RJN, Exh. 2 at 11, Docket entry 15-4, and recognized "backlash against perceived censorship in response to filtering of content and alleged 'shadow banning,'' RJN, Exh. 3 at 3, Docket entry 15-5.  AB 587 was the Legislature's response to these concerns.

squelch disfavored speech, and make it more likely that social media platforms will "censor" Plaintiffs and others, such speculation fails in the face of the plain text and the history of the bill, both of which make clear that the Legislature took pains to ensure that AB 587 "*does not require* social media companies to moderate or remove hateful or incendiary content." *Id.* at 4 (emphasis added). Courts "assume that the objectives articulated by the legislature are actual purposes of the statute, unless an examination of the circumstances forces [the courts] to conclude that they could not have been a goal of the legislature." *Am. Fuel & Petrochem. Mfrs. v. O'Keefe*, 903 F.3d 903, 912 (9th Cir. 2018). *Accord NetChoice, LLC v. Att'y Gen.*, 34 F.4th at 1224 (holding that "when a statute is facially constitutional, a plaintiff cannot bring a free-speech challenge by claiming that the lawmakers who passed it acted with a constitutionally impermissible purpose," and observing that in *United States v. O'Brien*, 391 U.S. 367, 384 (1968), the Supreme Court refused to void the statute at issue "on the basis of what fewer than a handful of Congressmen said about it" given that Congress "had the undoubted power to enact" it if legislators had only made " 'wiser' speech[es] about it."). Here, nothing alleged in the complaint overcomes that strong presumption.[4]

In sum, the "[m]andated disclosure of accurate, factual, commercial information does not offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberty interests. Such disclosure furthers, rather than hinders, the First Amendment goal of the discovery

---

[4] In an attempt to demonstrate that AB 587's "true" purpose is to suppress protected speech, the Complaint cites and mischaracterizes public comments made by the Governor and the Attorney General. *Compare* Complaint ¶¶ 17-21 *with* RJN Exhs. 5-6, docket entries 15-7, 15-8. These statements are not part of the bill's legislative history. *See Am. Fuel & Petrochem. Mfrs. v. O'Keefe*, 903 F.3d at 912 (holding that the district court correctly found that statements by public officials "do not demonstrate that objectives identified by the legislature were not the true goals" of the statute). Moreover, under California law, legislative history consists of materials relating to the bill that the legislature as a body had before it when deliberated over the bill. *Noori v. Countrywide Payroll & HR Solutions, Inc.*, 257 Cal. Rptr. 3d 102, 110 n. 11 (Cal. Ct. App. 2019). The statements plaintiffs cite were not before the Legislature, and in fact post-date the Legislature's vote. *See* RJN, Exhs. 5-6, Docket entries 15-7 - 15-8.

of truth and contributes to the efficiency of the 'marketplace of ideas.'" *Nat'l Elec. Mfrs. Assn. v. Sorrell*, 272 F.3d at 113-114.  AB 587 "furthers, rather than hinders," that goal.

### C.   The Complaint Fails to Allege Facts That Would Support a Finding That AB 587 Is Unduly Burdensome.

A disclosure requirement could violate the First Amendment if it was so "unjustified or unduly burdensome" that it "chill[s] protected commercial speech." *Zauderer*, 471 U.S. at 651. *See CTIA*, 928 F.3d at 848–49; *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d at 27 ("*Zauderer* cannot justify a disclosure so burdensome that it essentially operates as a restriction on constitutionally protected speech").  Nothing in the statute or the Complaint suggests that the disclosure requirements of AB 587—which apply only to social media companies with $100 million in annual revenues and do not apply to any of the Plaintiffs—is unduly burdensome.

## III.   PLAINTIFFS' OVERBREADTH CLAIM FAILS.

Plaintiffs' overbreadth claim also fails as a matter of law.  A statute may be unconstitutionally overbroad only where a plaintiff has shown that the "law is written so broadly that it may inhibit the constitutionally protected speech of a third party, even if his own speech may be prohibited." *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998).  To prevail on a facial overbreadth challenge, a plaintiff must show that "a substantial number of [a law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Knox v. Brovich*, 907 F.3d 1167, 1180 (9th Cir. 2018) (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)).  Invalidation of a statute for First Amendment "overbreadth is 'strong medicine' that is not to be 'casually employed.'" *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1581 (2020) (citation omitted).

Here, Plaintiffs' overbreadth challenge rests on their misunderstanding of the statute, specifically, its contention that AB 587 "regulates 'hate speech,' 'racism,'

'extremism,' and 'misinformation,' and 'disinformation,'" and thus "extends to a variety of legal, constitutionally protected speech." *Id.* ¶ 112.  As discussed above, AB 587 simply requires social media companies to publicly disclose information *about* their content-moderation policies and decisions; it does not regulate the *substance* of those policies and decisions.  Nor does it regulate the speech of social media users, who are free to post any content they wish, subject to the platform's *independent* content-moderation policies and decision-making.[5]  As made clear by case law in this circuit, social media companies are private actors with their own First Amendment rights, and their content-moderation decisions are not attributable to the State absent exceptional circumstances not alleged here.  *See O'Handley v. Padilla*, 579 F. Supp. 3d at 1172 ("Like a newspaper or a news network, [social media platforms] make decisions about what content to include, exclude, moderate, filter, label, restrict, or promote, and those decisions are protected by the First Amendment."); *O'Handley v. Weber*, 62 F.4th at 1156-618 (9th Cir. 2023) (holding that First Amendment claim based on alleged government influence on private actor requires that the government official "exercise coercive power or [have] provided such encouragement, either overt or covert, that the choice must be deemed in law to be that of the State" (citation omitted).

## IV.  PLAINTIFFS' VAGUENESS CLAIM FAILS,

The Complaint also fails to allege a cognizable claim that AB 587 is unconstitutionally vague.  A challenge on vagueness will be upheld only if the

---

[5] Plaintiffs further suggest that the law is under-inclusive because it does not include child pornography in addition to the categories of content listed in section 22677(a)(3).  *See* Complaint ¶¶ 30-31.  This, too, fails to state a claim.  Child pornography is not speech under the First Amendment and is a crime under California and federal law.  *See* Cal. Penal Code §§ 311-311.12; 18 U.S.C. § 2251.  The appropriate response to child pornography on a social media platform is a criminal prosecution, not merely suspension of the sex offender's social media account.  Moreover, "the First Amendment imposes no freestanding 'underinclusiveness limitation' . . . ." *French v. Jones*, 876 F.3d 1228, 1238 (9th Cir. 2017) (quoting *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015)).

1  enactment is impermissibly vague in all of its applications, or specifies "no

2  standard of conduct . . . at all." *Village of Hoffman Estates v. Flipside, Hoffman*

3  *Estates, Inc.*, 455 U.S. 489, 494-495, 489 n. 7 (1982); *Boutilier v. Immigr. &*

4  *Naturalization Serv.*, 387 U.S. 118, 121 (1967) (statute must be "so vague and

5  indefinite as really to be no rule or standard at all").

6      Plaintiffs' claim fails because, as explained, AB 587 does not apply to

7  Plaintiffs at all. *See O'Handley*, 62 F.4th at 1164 (upholding dismissal of vagueness

8  challenge to statute that "was never applied" to the plaintiff). But even if Plaintiffs

9  were subject to AB 587's disclosure requirements, the claim would still fail.

10  Plaintiffs allege that AB 587 is unconstitutionally vague because it "includes

11  numerous broad, vague and ambiguous terms" such as "'hate speech,' 'racism,'

12  extremism,' 'radicalization,' 'disinformation,' 'misinformation,' and 'foreign

13  political interference.'" *Id.* ¶ 118. But Plaintiff do not explain why those terms are

14  either vague or indefinite. Moreover, Plaintiffs themselves plainly understand the

15  terms, since they are able to allege that Minds' content-moderation policy does *not*

16  regulate these categories of content. *Id.* ¶ 86. More fundamentally, AB 587 does

17  not require that social media companies moderate user content at all. And with

18  respect to those terms in particular, AB 587 simply requires a covered social media

19  company to include in its report to the Attorney General "[a] statement of *whether*

20  the current version of the terms of service defines" each of those terms, and if so,

21  include the definitions it is report. § 22677(a)(3) (italics added). Thus, the social

22  media companies themselves decide how they choose to define those terms.

23  Plaintiffs' claim of unconstitutional vagueness fails as a matter of law.

24  **V.   THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE CALIFORNIA**
25  **CONSTITUTION.**

26      Because Plaintiffs' federal claims all fail as a matter of law, the Court should

27  decline to exercise supplemental jurisdiction over Plaintiffs' state-law claim for

28  violation of California's version of the First Amendment. *See O'Handley v.*

1  *Padilla*, 579 F. Supp. 3d at 1185.  Regardless, that claim, too, fails as a matter of

2  law.

3  **A.  Plaintiffs' State Law Claim Is Barred by the Eleventh Amendment.**

4  First, Plaintiff's claim under the California Constitution is squarely barred

5  under the Eleventh Amendment, which prohibits suits against a state in federal

6  court for all types of legal or equitable relief in the absence of consent by the state

7  or abrogation of that immunity by Congress.  *Pennhurst State Sch. & Hosp. v.*

8  *Halderman*, 465 U.S. 89, 100 (1984) (citations omitted).  "The Eleventh

9  Amendment [also] bars a suit against state officials when 'the state is the real,

10  substantial party in interest.'"  *Pennhurst*, 465 U.S. at 101 (citation omitted).  "And,

11  as when the State itself is named as the defendant, a suit against state officials that

12  is in fact a suit against a State is barred regardless of whether it seeks damages or

13  injunctive relief."  *Id*. at 101-02.  Here, any judgment entered in this challenge to

14  AB 587 would operate against the State.

15  In *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court recognized a

16  limited exception to Eleventh Amendment immunity.  However, the exception only

17  allows "suits for prospective declaratory and injunctive relief against state officers,

18  sued in their official capacities, to enjoin an alleged ongoing violation of *federal*

19  law."  *Agua Caliente Band of Cahuilla Indians v. Hardin*, 223 F.3d 1041, 1045 (9th

20  Cir. 2000) (emphasis added).  The *Ex parte Young* exception does apply to state-

21  law claims.  *Pennhurst*, 465 U.S. at 106-107; *Doe v. Regents of Univ. of Cal*., 891

22  F.3d 1147, 1153 (9th Cir. 2018).

23  **B.  Plaintiffs' Claim Under the California Constitution Fails for the Same Reasons Their First Amendment Claim Fails.**

24

25  Even if the claim were not barred by the Eleventh Amendment, AB 587 does

26  not violate free speech rights under the California Constitution as a matter of law.

27  While Article I's free speech provision is at least as broad as the comparable

28  provision of the federal Constitution's First Amendment, *Beeman v. Anthem*

*Prescription Mgmt., LLC*, 165 Cal. Rptr. 3d 800, 821-22 (Cal. 2013), on the issue of compelled commercial disclosures the analysis and result are the same.  In *Beeman*, the California Supreme Court applied California Constitution article I, section 2, to a state law requiring prescription drug claim processors to compile and disclose information on pharmacy fees.  *Id.* at 804.  The Court held that the statutes, which required factual disclosures about prescription drug prices, were subject to rational basis review, and that they "satisfie[d] that standard because the compelled disclosures are reasonably related to the Legislature's legitimate objective of promoting informed decision-making about prescription drug reimbursement policies."  *Id.*  Drawing on federal case law, the Court held that "[l]aws requiring a commercial speaker to make purely factual disclosures relating to its business affairs, whether to prevent deception or simply to promote informational transparency, have a purpose consistent with the reasons for according constitutional protection to commercial speech."  *Id.* at 822.  The Court expressly rejected arguments that the statute forced the affected parties to support a political position adverse to their interests, because the information might be used to influence public debate on drug reimbursement rates.  *Id.* at 816.

Here, too, the fact that the disclosures required by AB 587 might spur debate on the role social media platforms should play in moderating content does not render the disclosure requirement either subjective or controversial.  The Complaint fails to state a claim under article I, section 2 of the California Constitution.

## VI.   LEAVE TO AMEND SHOULD BE DENIED.

Leave to amend need not be granted if "it is clear that the complaint could not be saved by an amendment."  *Livid Holdings Ltd.*, 416 F.3d at 946.  Plaintiffs' claims fail as a matter of law, and the defects in the Complaint cannot be saved by an amendment.  The Court should not grant Plaintiffs leave to amend.

## CONCLUSION

The Court should dismiss the Complaint without leave to amend.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  May 3, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
PAUL STEIN
Supervising Deputy Attorney General


*/s/ Sharon L. O'Grady*
SHARON L. O'GRADY
Deputy Attorney General
*Attorneys for  Defendant*

SA2023302140
43683589.docx

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendant certifies that this brief contains 6,695 words, which:

 X  complies with the word limit of L.R. 11-6.1.

 X  complies with the page limit set by court order dated April 13, 2023.

Dated:  April 18, 2023                    Respectfully submitted,

ROB BONTA
Attorney General of California


*/s/ Sharon L. O'Grady*
SHARON L. O'GRADY
Deputy Attorney General
*Attorneys for Defendant*