JAMES R. LAWRENCE, III (admitted pro hac vice)
jlawrence@envisage.law
ENVISAGE LAW
2601 Oberlin Road, Suite 100
Raleigh, North Carolina 27608
Phone: 919.755.1317
Facsimile: 919.782.0452

SEAN P. GATES (SBN 186247)
sgates@charislex.com
CHARIS LEX P.C.
225 S. Lake Ave., Ste. 300
Pasadena, CA 91101
Phone: 626.508.1715
Facsimile: 626.508.173

*Attorneys for Plaintiffs Minds, Inc.,
Tim Pool, The Babylon Bee LLC,
National Religious Broadcasters*

MICHAEL P. FARRIS (admitted pro hac vice)
mfarris@nrb.com
NATIONAL RELIGIOUS BROADCASTERS
600 N. Capitol Street, N.W., Suite 210
Washington, DC 20001
Phone: 202.543.0073
Facsimile: 202.543.2649

*Attorney for Plaintiff National Religious Broadcasters*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| **MINDS, INC., TIM POOL, THE BABYLON BEE LLC, and NATIONAL RELIGIOUS BROADCASTERS,**<br><br>          **Plaintiffs,**<br><br>          **v.**<br><br>**ROBERT A. BONTA, Attorney General of California, in his official capacity,**<br><br>          **Defendant.** | Case No.: 2:23-cv-02705-RGK-MAA<br><br>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**<br><br>Date: June 26, 2023<br>Time: 9:00 am<br>Courtroom: 10B |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................... 1

BACKGROUND ........................................................................................... 1

I.    AB 587's Legislative History…………………………………………… 1

II.   AB 587's Text………………………………………………………………2

III.  AB 587's Impact on Plaintiffs………………………………………… 4

A. Minds, Inc. ........................................................................................ 4

B. Tim Pool ............................................................................................ 5

C. The Babylon Bee ............................................................................. 5

D. National Religious Broadcasters .................................................. 6

LEGAL STANDARD ................................................................................... 6

ARGUMENT .................................................................................................. 6

I.    Plaintiffs have standing and their claims are ripe for review…………………… 6

A. NRB has established associational standing. ........................................ 8

B. Plaintiffs Minds, The Babylon Bee, and Pool have standing because AB 587 threatens a conduit of speech. ........................................ 9

II.   Plaintiffs' First Amendment challenge to AB 587 is viable………………… 13

A. AB 587 is a content-based speech regulation subject to strict scrutiny that should not receive the more deferential review under *Zaudeder*.....................................13

1.  Disclosures about constitutionally-protected speech are not "purely factual and uncontroversial."...............................................15

2.  California has no substantial interest in the disclosures at issue. .....................16

3.  AB 587 unduly burdens speech...............................................18

III.  Plaintiffs' overbreadth claim is actionable…………………………………………19

IV.   AB 587 is unconstitutionally vague…………………………………………………20

CONCLUSION ..............................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*4805 Convoy, Inc. v. City of San Diego*, 183 F.3d 1108 (9th Cir. 1999) .......................... 7

*Acorn Invs., Inc. v. City of Seattle*, 887 F.2d 219, 226 (9th Cir. 1989) ..........................20

*Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749 (9th Cir. 2019) .....19

*Am. Unites for Kids v. Rousseau*, 985 F.3d 1075 (9th Cir. 2021) ................................... 8

*Arizona Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002 (9th Cir. 2003) ........ 7

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002) ...............................................17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................... 6

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) ............................................ 10, 11, 13

*California Tchrs. Ass'n v. State Bd. of Educ.*, 271 F.3d 1141 (9th Cir. 2001)..................20

*City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471

(2022) ..........................................................................................................................14

*Cohen v. California*, 403 U.S. 15, 25 (1971) .................................................................16

*CTIA - The Wireless Ass'n v. City of Berkeley, California*, 854 F.3d 1105 (9th Cir. 2017)

.....................................................................................................................................15

*CTIA - The Wireless Ass'n v. City of Berkeley, California*, 928 F.3d 832, 848 (9th Cir.

2019) ......................................................................................................................15, 16

*Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992) ....................................... 7

*Hoeg v. Newsom*, No. 2:22-CV-01980 WBS AC, 2023 WL 414258, at *12 (E.D. Cal.

Jan. 25, 2023) .............................................................................................................20

*Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333 (1977) ........................ 8

*Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 825 (9th Cir. 2021) ............... 8

*Italian Colors Rest. v. Becerra*, 878 F.3d 1165 (9th Cir. 2018) ...................................... 7

*John Doe No. 1 v. Reed*, 561 U.S. 186, 201 (2010) ......................................................17

*Lamont v. Postmaster General*, 381 U.S. 301 (1965) ....................................................10

*Leonard v. Clark*, 12 F.3d 885 (9th Cir. 1993) .............................................................. 9

*Libertarian Party of Los Angeles Cnty. v. Bowen*, 709 F.3d 867 (9th Cir. 2013).......10, 12

ENVISAGE LAW

ENVISAGE LAW

*LSO, Ltd. v. Stroh*, 205 F.3d 1146 (9th Cir. 2000)........................................7, 11

*Mahoney v. Sessions*, 871 F.3d 873 (9th Cir. 2017) ......................................10

*Meese v. Keene*, 481 U.S. 465 (1987) ............................................................10

*Missouri v. Biden*, No. 3:22-CV-01213, 2023 U.S. Dist. LEXIS 46918 (W.D. La. Mar. 20, 2023) ................................................................................................12

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361 (2018).....................15, 19

*Nat'l Rifle Ass'n of Am. v. City of Los Angeles*, 441 F. Supp. 3d 915, 934 (C.D. Cal. 2019) ................................................................................................17

*NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196 (11th Cir. 2022)...........................12, 18

*NetChoice, LLC v. Paxton*, 49 F.4th 439 (5th Cir. 2022)...............................12, 18

*O'Handley v. Padilla*, 579 F. Supp. 3d 1163 (N.D. Cal. 2022)....................................20

*O'Handley v. Weber*, 62 F.4th 1145 (2023) (9th Cir. 2023) ...............................20

*Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018 (N.D. Cal. 2014) ...................................13

*Prison Legal News v. Livingston*, 683 F.3d 201 (5th Cir. 2012) ..............................7

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ......................................................14

*Recycle for Change v. City of Oakland*, 856 F.3d 666 (9th Cir. 2017)...........................14

*Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)..................................................14

*Rivera v. Carter*, No. 2:09-CV-2435-FMC, 2009 WL 8753486 (C.D. Cal. July 31, 2009)7

*Snyder v. Phelps*, 562 U.S. 443 (2011)...................................................................14

*Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ...............................................6, 7

*United States v. Williams*, 553 U.S. 285, 292 (2008)..............................................19

*Volokh v. James*, No. 22-CV-10195 (ALC), 2023 WL 1991435, at *7 (S.D.N.Y. Feb. 14, 2023) ................................................................................................18

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) ................ 14, 15, 18, 19

**Statutes**

Cal Bus. & Prof. Code § 22676(b)(2)............................................................... 3

Cal Bus. & Prof. Code § 22677(a)(3)............................................................3, 14, 19

Cal Bus. & Prof. Code § 22677(a)(5)............................................................3, 9, 19

Cal. Bus. & Prof. Code § 22676(a) .................................................................. 3

Cal. Bus. & Prof. Code § 22678................................................................19

Cal. Bus. & Prof. Code § 22678(a)(1)-(2) ...............................................3, 4

N.Y. Gen. Bus. Law § 394-ccc .................................................................18

Tex. Bus. & Comm. Code § 120.052(b)(4)(1)...........................................18

ENVISAGE LAW

OPPOSITION TO MOTION TO DISMISS

**ENVISAGE LAW**

# INTRODUCTION

In enacting AB 587, California political leaders, foremost Governor Gavin Newsom, wanted to "protect Californians from hate and disinformation spread online." Soon after Governor Newsom signed the law, Attorney General Rob Bonta wrote a letter to Meta, TikTok, Twitter, Reddit, and Google invoking AB 587 as one of the tools he would use to "stop the spread of disinformation and misinformation" and demanded they "do more to rid your platforms of the dangerous disinformation, misinformation, conspiracy theories, and threats that fuel political violence, spread fear and distrust, and ultimately chill our democratic process." For using the drafter's own words, the Attorney General accuses Plaintiffs of "hyperbole" for what he mundanely describes as a measure to "provide transparency to California consumers" akin to "consumer disclosure statutes, such as food labeling and truth-in-lending laws." In other words, with AB 587, there is nothing to see here, just another cost of doing business in the nation's largest economy.

The Attorney General cannot save the California Legislature's handiwork from constitutional scrutiny. AB 587 is tailor-made to do precisely what its architects designed it to do: chill speech protected by the First Amendment. Far from some benign disclosure law, California leaders want AB 587 to shut down speech they disagree with. The Constitution does not allow that. This Court should deny the Attorney General's motion.

# BACKGROUND

## I.    AB 587's Legislative History

On March 29, 2021, California Assemblymember Jesse Gabriel introduced AB 587. Under the headline "California Legislators Introduce Bipartisan Effort to Hold Social Media Companies Accountable for Online Hate and Disinformation," Assemblymember Gabriel's office noted that "efforts by social media companies to self-police have been widely criticized as inadequate." (Dkt. 20 ¶ 52.)

As AB 587 made its way through the California State Legislature, legislators and legislative committees described how the bill would affect speech. An April 21, 2021 report from the Assembly Committee on Privacy and Consumer Protection quoted

1

ENVISAGE LAW

arguments in favor of the law that "efforts by social media companies to self-police [problematic] content have been . . . inadequate." (*Id.* ¶ 53.) In June 2021, Assemblymember Gabriel, the bill's lead author, confirmed that AB 587 "addresses . . . concerns that platforms aren't doing enough to stop the spread of misinformation and hate speech." (*Id.* ¶ 54.)

The California Senate Judiciary Committee released an analysis of AB 587, which notes the Los Angeles County Democratic Party's support for the bill. The Party argued that AB 587 would address the problem of how "[s]ocial media companies have behaved irresponsibly, allowing disinformation, misinformation and hate to add fuel to some of America's greatest challenges." (*Id.* ¶ 59.)

An August 15, 2022, Senate Floor Analysis of AB 587 quotes Assemblymember Gabriel saying that "[t]he line between providing an open forum for productive discourse and permitting the proliferation of hate speech and misinformation is a fine one." (*Id.* ¶ 60.) At a press conference held on the morning of August 30, 2022, Assemblymember Gabriel reiterated these concerns, arguing for AB 587's passage, in part, because "social media platforms aren't doing enough to address their role in promoting online hate and fueling dangerous conspiracy theories." (*Id.* ¶ 61.) The same day, the California State Legislature passed AB 587.

Governor Gavin Newsom signed AB 587 into law on September 13, 2022. The Governor's office explained that AB 587, a "first-of-its-kind social media transparency measure," is really designed to "protect Californians from hate and disinformation spread online." (*Id.* ¶ 21.) "California will not stand by as social media is weaponized to spread hate and disinformation that threaten our communities and foundational values as a country," Governor Newsom explained further. (*Id.*)

## II.   AB 587's Text

AB 587 contains seven sections. Social media companies subject to the statute must "post terms of service" and provide certain reporting to the Attorney General or risk being "liable for a civil penalty not to exceed fifteen thousand dollars ($15,000) per

ENVISAGE LAW

violation per day." Cal. Bus. & Prof. Code § 22678(a)(1)-(2). AB 587 applies to any "social media company" with more than $100 million in annual revenue. While there are some edge cases about what companies AB 587 might cover, Twitter, Meta's Facebook and Instagram, YouTube, and Twitter all fall within the statute's scope.

AB 587 contains two particularly problematic provisions. *First*, to avoid being punished by the State of California, social media companies must post state-sanctioned "terms of service." The terms are not optional. Every covered social media company "shall post terms of service" and "in a manner reasonably designed to inform all users of the social media platform of the existence and contents of the terms of service." Cal. Bus. & Prof. Code § 22676(a). AB 587 requires social media companies to engage in some form of content moderation. The companies must maintain a system to allow users to "flag content, groups, or other users." *Id.* § 22676(b)(2). The statute says companies' terms of service must include "commitments on response and resolution time." *Id.* That means complaints require some response by a certain time—no response or an untimely response is not an option.

The *second* major requirement within AB 587 is a so-called "terms of service report." Under this mandate, social media companies must provide Attorney General Bonta with, among other things, a "statement of whether the current version of the terms of service defines each of the following categories of content, and, if so, the definitions of those categories, including any subcategories" of the following: "Hate speech or racism"; "Extremism or radicalization"; "Disinformation or misinformation"; "Harassment"; and "Foreign political interference." *Id.* § 22677(a)(3). Those eight categories are undefined.

In addition, AB 587 requires extensive reporting about "[i]nformation on content that was flagged by the social media company as content belonging to any of the categories described in paragraph (3)," meaning the eight categories described above. *Id.* § 22677(a)(5). Companies must provide details regarding seven different data points. *Id.* § 22677(a)(5)(A)(i)-(vii). This reporting must be further disaggregated into five additional categories. *Id.* § 22677(a)(5)(B).

3

A company that "[m]aterially omits or misrepresents required information in a report submitted" to the Attorney General is subject to "a civil penalty" of up to "fifteen thousand dollars ($15,000) per violation per day, and may be enjoined in any court of competent jurisdiction." *Id.* §§ 22678(a)(1), (a)(2)(C). In other words, the statute gives the Attorney General and city attorneys the power to challenge whether a social media platform has correctly categorized, flagged, or actioned, effectively allowing these government agents to second guess social media platform decisions.

The Attorney has already referenced AB 587 in issuing threats of legal action against social media companies. "Disinformation and misinformation pose very real and growing threats to our democracy and to the rule of law," Attorney General Bonta wrote in a November 2022 letter to Meta, YouTube, Twitter, and other social media platforms. (Dkt. 20 ¶ 22.) The Attorney General cited AB 587, claiming it "requires disclosures on content moderation practices as it relates to extremism or radicalization, disinformation or misinformation, and foreign political interference, among other areas." (*Id.* ¶ 23.)

## III.   AB 587's Impact on Plaintiffs

Plaintiffs in this action are an emerging social media network, two prominent social media users, and an organization that represents hundreds of religious broadcasters, including at least one member that operates social media platforms. (*Id.* ¶ 9.) Plaintiffs have different injuries traceable to AB 587.

### A.   Minds, Inc.

Minds, Inc. operates the social networking app Minds, which has users across the country, including in the State of California. (*Id.* ¶ 10.) Minds' stated mission "is to bring Internet freedom back to social media." (*Id.*) Minds has more than 260,000 combined followers on Twitter and Facebook. (*Id.*)

Minds moderates only limited categories of speech, none of which include any of the eight categories set out in AB 587. (*Id.* ¶ 90.) As a result, Minds cannot produce a report for Attorney General Bonta on the prevalence of "hate speech" "racism," "extremism," "radicalism," "disinformation," "misinformation," "harassment" or

"foreign political interference" on the company's platform. (*Id.* ¶ 91.) While Minds currently earns less than $100 million in annual revenue, AB 587 stunts its ability to raise money and expand its operation. (*Id.* ¶ 92.) In addition, Minds relies on companies that are directly regulated by AB 587 to distribute its app, which are more likely to censor Minds on account of the censorious industry standards the law promotes. (*Id.* ¶¶ 71-89.)

As a social media user itself, AB 587 threatens Minds. Twitter and Facebook fall within AB 587's scope. On Twitter, Minds' posts have been subjected to a "sensitive content" filter, something reserved for violence and nudity. (*Id.* ¶ 99.) Facebook has also limited the reach of Minds' content. (*Id.*) AB 587 incentivizes more of this censorship.

## B.    Tim Pool

Tim Pool is a social media content creator with more than 5 million followers across YouTube and Twitter. (*Id.* ¶ 11.) Pool's YouTube content has been viewed more than 1.5 billion times (*Id.*) Pool's critics frequently accuse him of creating "hate speech," "disinformation," and "extremism" as part of campaigns to deplatform him. (*Id.*) For example, in a report published in May 2022, the Southern Poverty Law Center claimed that YouTube is profiting from Pool's show, which the organization accused of "spreading COVID-19 disinformation and making racist commentary." (*Id.* ¶ 100.) AB 587 will cause Pool to engage in self-censorship to avoid being deplatformed. (*Id.* ¶ 105.)

## C.    The Babylon Bee

The Babylon Bee LLC publishes satirical news articles on the website www.babylonbee.com, which averages more than 20 million viewers per month. (*Id.* ¶ 12.) The Bee posts its satire across its social media accounts, which have more than 6.8 million followers across Twitter, Facebook, Instagram, and YouTube. (*Id.*)

The Bee has been censored. In March 2022, Twitter suspended the Bee's Twitter account after it published a tweet regarding Admiral Rachel Levine. (*Id.* ¶ 101.) Twitter suspended the Bee for allegedly violating the company's hateful conduct policy. (*Id.*) The Bee continues to be charged with spreading "hate," "misinformation," and "conspiracy" by its critics. (*Id.*) The Bee remains very much a target for censorship from social media

ENVISAGE LAW

platforms. Like Minds and Pool, AB 587 increases the likelihood social media companies will censor the Bee's speech.

### D. National Religious Broadcasters

National Religious Broadcasters ("NRB") is a nonpartisan, international association of Christian communicators whose member organizations represent millions of listeners, viewers, and readers who use social media. (*Id.* ¶¶ 13, 15.) NRB members have often been accused of engaging in "hate speech" for airing their views on issues like abortion, gender identity, and sexuality from a religious point of view. (*Id.* ¶ 102.)

Salem Media Group, Inc. is an NRB member. (*Id.* ¶ 16.) Salem, which has more than $100 million in annual revenue, operates the websites GodTube and TeacherTube. (*Id.*) GodTube and TeacherTube both allow users to create profiles, subscribe to other user's channels, and upload their own content. (*Id.*) Salem has been accused of promoting "misinformation." (*Id.* ¶ 81.) Because of its annual revenues and operations, Salem is directly regulated by AB 587, and "will be forced to provide burdensome reporting and compelled to censor speech to avoid penalties." (*Id.* ¶ 121.)

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable." *Id.*

## ARGUMENT

### I. Plaintiffs have standing and their claims are ripe for review.

To establish standing, Plaintiffs must show they "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and

ENVISAGE LAW

'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

While the First Amendment does not require or permit these standards to be disregarded, "[c]onstitutional challenges based on the First Amendment present unique standing considerations" in order "[t]o avoid the chilling effect of sweeping restrictions." *Arizona Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003). "[W]hen the threatened enforcement effort implicates First Amendment rights, the [standing] inquiry tilts dramatically toward a finding of standing." *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1172 (9th Cir. 2018) (quoting *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000) (brackets in original)). This relaxed First Amendment standard is particularly evident in cases where litigants have challenged laws which chill speech or are overbroad. *See, e.g.*, *4805 Convoy, Inc. v. City of San Diego*, 183 F.3d 1108, 1112 (9th Cir. 1999) ("[U]nder the Supreme Court's 'overbreadth' doctrine, a plaintiff may challenge an overly broad statute or regulation by showing that it may inhibit the First Amendment rights of individuals who are not before the court.")

Relevant here, standing can be established if the State is "applying pressure and threats to a necessary conduit." *LSO*, 205 F.3d at 1153. "Government interference with one's attempts to sell or distribute written material unquestionably satisfies Article III's injury-in-fact requirement." *Prison Legal News v. Livingston*, 683 F.3d 201, 212 (5th Cir. 2012). A "[p]laintiff is entitled to challenge the alleged [violation] because it directly impacts his personal rights, and because nobody else has challenged [it]." *Rivera v. Carter*, No. 2:09-CV-2435-FMC, 2009 WL 8753486, at *2 (C.D. Cal. July 31, 2009). "The very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129 (1992). Plaintiffs' amended complaint presents an Article III case or controversy.

**A. NRB has established associational standing.**

Plaintiff NRB has associational standing to bring this lawsuit. "An association or organization can sue based on injuries to itself or to its members." *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1096 (9th Cir. 2021) (citing *Warth v. Seldin*, 422 U.S. 490, 511 (1975)) "When suing on behalf of its members, an organization must show that its members would have individual standing, the issues are germane to the organization's purpose, and neither the claim nor the requested relief requires individual participation." *Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 825, 831 (9th Cir. 2021).

NRB meets all three requirements. NRB member Salem Media Group, Inc. is a social media company with more than $100 million dollars in annual revenue as defined by AB 587, and thus will subject to onerous reporting requirements, and investigation should Attorney General Bonta believe that Salem has not correctly categorized, flagged, and actioned speech on its platforms, and fines should a court determine that Salem's decisions regarding censoring speech were incorrect. (Dkt. 20 ¶¶ 17, 107.) AB 587 will compel Salem Media to "censor speech to avoid penalties." (*Id.* ¶ 121.)

In addition, NRB's other members, including Salem, use large social media platforms to reach their audiences and have been repeatedly accused of publishing "misinformation" and "hate," which makes it more likely for companies that are regulated by AB 587 to censor their speech. (*Id.* ¶¶ 15, 102-103.) Since its founding, NRB has advocated for the First Amendment rights of its members. (*Id.* ¶¶ 13-14.) Finally, a First Amendment challenge seeking to enjoin a facially unconstitutional statute does not require individual participation. *See Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977) ("[R]equest for declaratory and injunctive relief requires individualized proof and both are thus properly resolved in a group context.").

The Attorney General does not dispute that the NRB's member Salem would be directly subject to the regulation. Rather he argues that Salem is not injured because the law "does not tell social media platforms what they must do, it only requires them to accurately report their terms of service and actions they have taken to enforce their terms

of service." (Dkt. 23-1 at 17:11-13.) According to the Attorney General, if a social media platform does not moderate "misinformation," the company does not have to report on the category. But the plain text of the statute is contrary to this litigation-induced interpretation of AB 587, which was entirely missing from the Attorney General's November 2022 threat to the social media companies. He specifically advised the companies that AB 587 "requires disclosures on content moderation practices as it relates to extremism or radicalization, disinformation or misinformation, and foreign political interference, among other areas." (Dkt. 20 ¶ 23.) By its language, the statute requires detailed "[i]nformation on content that was flagged by the social media company as content belonging to any of the categories" set forth in the statute ("hate speech," "misinformation," etc.).  Cal. Bus. & Prof. Code § 22677(a)(5)(A).  Nothing in the statute limits this reporting to categories already in a platform's terms of service.

### B. Plaintiffs Minds, The Babylon Bee, and Pool have standing because AB 587 threatens a conduit of speech.

The other Plaintiffs also have standing. "The general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others." *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993), as amended (Mar. 8, 1994) (citing *Carey v. Population Services Int'l*, 431 U.S. 678, 682 (1977)). Under this one-plaintiff rule, because NRB member Salem Media would have standing, the standing inquiry is complete.

Beyond the one-plaintiff rule, Minds, Pool, and The Babylon Bee have standing based on two injuries.  First, the statute will make it more likely that social media platforms will moderate or censor their content. (Dkt. 20 ¶ 118.)  This is not speculation. As alleged by a social media platform, Salem, the statute will "affect [its] editorial decisions regarding thousands of postings on its social media platforms as it must consider whether Attorney General Bonta will agree with its categorization, flagging, and actioning of those posts." (*Id.* ¶ 107.) Second, AB 587 will force plaintiffs to self-censor to avoid having their content restricted or banned.  (Dkt. 20 ¶ 119.)  "A chilling of the

ENVISAGE LAW

1    exercise of First Amendment rights is, itself, a constitutionally sufficient injury."

2    *Libertarian Party of Los Angeles Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013).

3         Minds, a company whose stated goal "is to bring Internet freedom back to social

4    media," (Dkt. 20 ¶ 10), and which refuses to moderate categories of speech like

5    "misinformation" and "disinformation," (*id.* ¶ 90), alleges that AB 587 creates a

6    censorious industry standard, and that the law makes it less likely critical outlets such as

7    Google and Apple will carry Minds' app. (*Id.* ¶¶ 71-89.) Minds also asserts that AB 587

8    cabins the company's market growth, setting an artificial ceiling of $100 million in

9    annual revenues. (*Id.* ¶ 92.) As social media users, Minds, Pool, and The Babylon Bee

10   have all faced past censorship of speech that would otherwise be constitutionally

11   protected, a situation AB 587 makes more likely will recur, leading to self-censorship.

12   (*Id.* ¶¶ 99-101.) These allegations, all of which must be accepted as true and construed in

13   Plaintiffs' favor at the Rule 12(b)(6) stage, *Mahoney v. Sessions*, 871 F.3d 873, 877 (9th

14   Cir. 2017), are sufficient to establish standing.

15        That AB 587 does not directly regulate Minds, Pool, The Bee, or some NRB

16   members does not mean these Plaintiffs do not have standing to challenge the law. Social

17   media may be relatively new, but government efforts to inhibit the flow of controversial

18   speech on important communications platforms are not. The Supreme Court has

19   repeatedly rebuffed these efforts. In *Lamont v. Postmaster General*, 381 U.S. 301 (1965),

20   a man who wanted to receive "communist political propaganda" through the mail sued to

21   invalidate a statute requiring the Post Office to screen out such materials unless the

22   addressee requested them. More than two decades later, in *Meese v. Keene*, the Supreme

23   Court used *Lamont* to illustrate standing, noting that "[a]lthough the statute was directed

24   to the Postmaster General, it affected addressee Lamont." *Meese v. Keene*, 481 U.S. 465,

25   476 (1987).

26        In *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), book publishers sued a

27   member of the Rhode Island Commission to Encourage Morality in Youth for sending

28   letters to the "distributor of appellants' publications." *Id.* at 61. The letters described

ENVISAGE LAW

books as "obscene, indecent or [containing] impure language, or manifestly tending to the corruption of the youth." *Id.* at 60 n.1. While the "Commission's notices were circulated only to distributors and not, so far as appears, to publishers" and it "purport[ed] only to regulate distribution," the Supreme Court noted "[a]ppellants' standing has not been, nor could it be, successfully questioned" because the "direct and obviously intended result of the Commission's activities was to curtail the circulation in Rhode Island of books published by appellants." *Id.* at 64 n. 6.

The Court also pointed to "pragmatic considerations" for standing, because the "distributor who is prevented from selling a few titles is not likely to sustain sufficient economic injury to induce him to seek judicial vindication of his rights" while "[t]he publisher has the greater economic stake, because suppression of a particular book prevents him from recouping his investment in publishing." *Id.* The Court concluded that "[u]nless" the publishers were "permitted to sue, infringements of freedom of the press may too often go unremedied." *Id.*; *see also LSO*, 205 F.3d at 1153-54 (relying upon *Bantam Books* to reject a defense of a "generalized grievance" when the government pressured a Convention Center to deplatform an "Erotic Art Exhibition").

Both the legal and pragmatic considerations at play in *Bantam Books* and *LSO* apply to Plaintiffs as content creators. AB 587's $100 million annual revenue requirement necessarily means the law will only apply to large social media platforms. The advertising revenue these platforms derive from Plaintiffs' content is a rounding error in these dominant firms' overall economic picture. Minds, Pool, The Babylon Bee, and NRB members all have "the greater economic stake" in their speech not being censored than companies like Google, Meta, and Twitter do in complying with AB 587.

The "pragmatic considerations" in *Bantam Books* have even greater weight here where other issues are at stake. As Plaintiffs allege, the Attorney General and his State peers have cited Facebook's perceived lack of content moderation as evidence of market power in their antitrust action against the company. (Dkt. 20 ¶ 78.) This is in addition to threats to revisit the immunity conferred the social media companies by section 230 of

ENVISAGE LAW

—

the Communications Decency Act on account of the companies' perceived failure to censor. *See Missouri v. Biden*, No. 3:22-CV-01213, 2023 U.S. Dist. LEXIS 46918 (W.D. La. Mar. 20, 2023).  Whether or not such conduct constitutes unconstitutional coercion, dominant tech firms such as Google or Facebook are less likely to challenge AB 587 due to fears that it could affect these more financially important regulatory and legal priorities. Producing a censorship report to the Attorney General's liking may be a more efficient route to produce shareholder returns, regardless of the effect on Plaintiffs.

The Attorney General's arguments against standing are unpersuasive. The Attorney General denies there is any injury here, (Dkt. 23-1 at 15:13), but it is well established that "a chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury." *Libertarian Party of Los Angeles Cnty.*, 709 F.3d at 870. Plaintiffs allege such a chilling effect throughout the amended complaint. (*See, e.g.*, Dkt. 20 ¶¶ 73, 98, 117.) The Attorney General's argument against injury-in-fact is largely an attack on Plaintiffs' substantive claims, which are addressed in detail below.

The Attorney General next argues AB 587 is not the cause of the alleged injuries. According to the Attorney General, Plaintiffs' "real complaint is that other persons and entities have their own free speech rights have exercised them to criticize" Plaintiffs, (Dkt 23-1 at 16:17-19), and that this has "nothing to do with AB 587," (*id.* at 16:11). As a threshold matter, the extent to which online platforms have a First Amendment right to censor users' lawful speech is unsettled. *Compare NetChoice, LLC v. Paxton*, 49 F.4th 439, 494 (5th Cir. 2022) (rejecting the platforms' First Amendment claims), *with NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1209 (11th Cir. 2022) (invalidating Florida's content-moderation law).

Even so, the platforms' speech rights are irrelevant to the standing of social media platform users. Plaintiffs allege that AB 587 will be used to encourage the platforms to censor more speech and that the Attorney General will and already has invoked the statute to pressure the platforms. (D.20 ¶¶ 6, 22-23.) That the platforms have engaged in moderation of lawful speech prior to the passage of the law does not affect standing. If it

did, then the publishers in *Bantam Books* would not have had standing because book distributors had the right to pick and choose what books to sell, and many declined to distribute books they determined were "manifestly tending to the corruption of the youth," even if not criminally obscene. 372 U.S. at 59-60. Moreover, Plaintiffs allege they are edge cases, which the platforms have sometimes restricted and sometimes allowed. (Dkt. 20 ¶¶ 101-102.) Social media users who do not publish controversial speech are unlikely to be impacted by AB 587, rather it is users on the edge like Plaintiffs which the statute will nudge toward censorship, directly injuring their rights.

The Attorney General does not deny the law may apply to app stores operated by Google and Apple, which may remove Minds' app in the future, but he similarly argues that the companies have the statutory right to remove content anyway under 47 U.S.C. § 230. (Dkt. 23-1 at 17:15-25.) This argument fails for the same reason as the Attorney General's invocation of social media companies' unsettled First Amendment rights to restrict user speech, but also because section 230 does not always apply to app stores. *See, e.g.*, *Opperman v. Path, Inc.*, 87 F. Supp. 3d 1018, 1044-45 (N.D. Cal. 2014) ("Apple's alleged conduct potentially constitutes contribution to the alleged illegality in a manner that invokes the information content provider exception to the CDA's protections." (internal quotation marks omitted)).[1]

## II.    Plaintiffs' First Amendment challenge to AB 587 is viable.

### A. AB 587 is a content-based speech regulation subject to strict scrutiny that should not receive the more deferential review under *Zaudeder*.

"A regulation of speech is facially content based under the First Amendment if it 'target[s] speech based on its communicative content'—that is, if it 'applies to particular

---

[1] The Attorney General briefly refers to ripeness, (Dkt. 23-1 at 15:7) but acknowledges that issue overlaps with the concerns about injury-in-fact. Because "pre-enforcement claims necessarily occur before enforcement actions have begun, the standing factors for pre-enforcement claims are substantively similar to the ripeness factors and identical concerns motivate both analyses," the claim is ripe for the same reason the plaintiffs have standing. *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1174 (9th Cir. 2022).

ENVISAGE LAW

speech because of the topic discussed or the idea or message expressed.'" *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). Viewpoint-based "laws—those that target speech based on its communicative content—are presumptively unconstitutional." *Reed*, 576 U.S. at 163. Further, even if a law was neutral on its face, a regulation may be view-point based if "there is evidence" it was passed "with an intent to burden" speech. *Recycle for Change v. City of Oakland*, 856 F.3d 666, 673 (9th Cir. 2017).

AB 587 is a viewpoint-based speech regulation. Far from being "agnostic as to content," the statute specifically asks for disclosures on "[h]ate speech or racism," "[e]xtremism or radicalization," "[d]isinformation or misinformation," "[h]arassment," and "[f]oreign political interference." Cal. Bus. & Prof. Code § 22677(a)(3). These categories of speech are constitutionally protected, and the Supreme Court has repeatedly rejected efforts to regulate them. *See, e.g.*, *Snyder v. Phelps*, 562 U.S. 443 (2011); *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) (striking down law prohibiting speech which would cause anger "basis of race, color, creed, religion or gender"). Nevertheless, AB 587 singles this speech out "for differential treatment," *City of Austin*, 142 S. Ct. at 1475, which the First Amendment forbids.

The Attorney General does not deny California could not outright prohibit such speech, but to save AB 587, he needs to evade strict scrutiny, so he seeks to classify the statute under the more forgiving standard offered under *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985). To shoehorn AB 587 into the *Zauderer* framework, the Attorney General argues that AB 587 "does not dictate content-moderation policies or decisions about any particular content" and thus "it involves compelled commercial speech of purely factual and uncontroversial information." (Dkt. 23-1 at 18:10-11.) However, the disclosures at issue are not merely "factual and uncontroversial" nor do they further a substantial government interest.

### 1. Disclosures about constitutionally-protected speech are not "purely factual and uncontroversial."

The Attorney General misstates Ninth Circuit precedent in defining "uncontroversial" speech in the *Zauderer* test by citing vacated precedent that "'[u]ncontroversial' refers to the 'factual accuracy of the compelled disclosure, not to its subjective impact on the audience.'" (Dkt. 23-1 at 18:28-19:1.) The Attorney General uses a short cite to *CTIA - The Wireless Ass'n v. City of Berkeley, California*, 928 F.3d 832, 848 (9th Cir. 2019) ("*CTIA II*").[2]  But that quote comes from an earlier decision in the case which the Supreme Court ultimately vacated in light of *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2372 (2018) ("*NIFLA*"). *CTIA - The Wireless Ass'n v. City of Berkeley, California*, 854 F.3d 1105 (9th Cir. 2017) ("*CTIA I*"), *cert. granted, judgment vacated sub nom.* 138 S. Ct. 2708 (2018).

While the Ninth Circuit ultimately held that the disclosures at issue were "factual and noncontroversial" in *CTIA II* it did so using a completely different standard. *CTIA I* held that the "uncontroversial" prong from *Zauderer* was completely superfluous and that "*Zauderer* requires only that the information be 'purely factual.'" 854 F.3d at 1117. However, this was clearly at odds with *NIFLA*, which enjoined a California statute requiring licensed pro-life "crisis pregnancy centers" to give notice regarding abortion and family planning services. 138 S. Ct. at 2369. Under the language the Attorney cited from *CTIA I*, this would be "uncontroversial" in that it there is no controversy to its factual accuracy. However, the Court held that *Zauderer* had no application because the disclosure was about "abortion, anything but an 'uncontroversial' topic." *Id.* at 2372.

Unlike *CTIA I*, in *CTIA II* the Ninth Circuit used the heading "Purely Factual and Uncontroversial Information." *CTIA II*, 928 F.3d at 844. Like abortion, discussions of "hate speech," "misinformation," and "extremism" are anything but "uncontroversial."

---

[2] The quote is cited as *CTIA I*, 854 F.3d at 1117. This is the correct reporter and page number, but the Attorney General only previously referred to 928 F.3d 832 (9th Cir. 2019) in his brief, does not include the 2017 case in the Table of Authorities, and does not mention the subsequent case history.

ENVISAGE LAW

ENVISAGE LAW

1  By only requiring disclosures on these narrow areas of speech, AB 587 is both viewpoint-

2  based and related to taking sides on a "a heated political controversy." *CTIA II*, 928 F.3d

3  at 845. The requirements are far different from the disclosures in *CTIA II*, which the court

4  likened to "a short-hand description of the warning the FCC already requires cell phone

5  manufacturers to include in their user manuals." *Id.* at 848.

6            **2.      California has no substantial interest in the disclosures at issue.**

7       The Attorney General contends that California's interest in AB 587 is to allow

8  "consumers [to] make informed decisions," analogizing the law to disclosure

9  requirements for hospital pricing and products with mercury. (Dkt. 23-1 at 20:12-13.)

10  However, these disclosures have no relationship to the burdens they create on

11  constitutionally protected speech, and that is particularly true under the Attorney

12  General's interpretation of the statute. Again, in this litigation at least, the Attorney

13  General maintains that AB 587 "does not tell social media platforms what they must do,

14  it only requires them to accurately report their terms of service and actions they have

15  taken to enforce their terms of service." (Dkt. 23-1 at 17:11-13.) According to the

16  Attorney General, if a platform does not moderate "misinformation," then there is no

17  reporting obligation. Moreover, he says, the platforms are free to define the various

18  categories of speech in AB 587 subjectively.

19       The justification for AB 587 collapses under this reading of the statute. AB 587's

20  primary architect, Assemblymember Jesse Gabriel explained his bill will allow the public

21  to assess "the relative effectiveness of different approaches," which will "allow for

22  comparative assessment of content moderation approaches to better equip both social

23  media companies and policy makers to address these growing concerns." Cal. Senate

24  Rules Comm., Aug. 15, 2022, at 4,

25  https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202120220AB58

26  7, (cited at Dkt. 20 ¶ 60). But if reporting is based on the platforms' subjective definitions

27  of the eight speech categories, then there are no comparisons to be made. "[O]ne man's

28  vulgarity" may be "another's lyric." *Cohen v. California*, 403 U.S. 15, 25 (1971). What is

16

ENVISAGE LAW

"misinformation" to Meta may be "disinformation" to Twitter. Policymakers would be left comparing apples, to oranges, to bananas, to tangerines. And the source data from this fruitless endeavor would come at great cost to companies like NRB member Salem to produce no discernible benefit, even on the primary architect of AB 587's own terms.

The Attorney General is more candid about AB 587's true design elsewhere in his motion to dismiss. He advises that "AB 587 may result in public pressure on social media companies to 'become better corporate citizens by doing more to eliminate hate speech and disinformation' on their platforms,'" but "[t]his, too, is a substantial state interest." (Dkt. 23-1 at 21:25-22:1.) The Attorney General goes on to cite legislative reports that "social media has become a powerful and largely unregulated platform for groups espousing hate, violence, bigotry, conspiracy theories and misinformation," and that "AB 587 was the Legislature's response to these concerns." (*Id.* 22:1 n.5.)

But the State has "no interest in the suppression of political advocacy—regardless of how distasteful it finds the content." *Nat'l Rifle Ass'n of Am. v. City of Los Angeles*, 441 F. Supp. 3d 915, 934 (C.D. Cal. 2019) ("*NRA*"). Even if "discriminatory tweets" correlated with hate crimes, the "government may not suppress lawful speech as the means to suppress unlawful" speech or conduct. *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002). While private parties may pressure social networks to change their content moderation policy, such as the "Stop Hate for Profit" ad boycotts aimed at Facebook, (Dkt. 20 ¶¶ 67-69), the government cannot use forced disclosure to assist in this "public pressure." *See John Doe No. 1 v. Reed*, 561 U.S. 186, 201 (2010) (noting that "[c]ompelled disclosure" can invite "reprisals from either Government officials or *private parties*") (quoting *Buckley v. Valeo*, 424 U.S. 1, 74 (1976) (emphasis added)).

The Attorney General dismisses the numerous statements by the sponsors of AB 587 calling for censorship by focusing on the legislature's stated purposes. But Plaintiffs have not just cited to isolated Twitter posts or press releases, but rather to the California State Legislature's committee reports and analyses, all of which corroborate the view is designed to "protect" Californians from certain categories of constitutionally-protected

17

ENVISAGE LAW

speech. (*See, e.g.*, Dkt. 20 ¶¶ 6, 22, 52.) This Court has considered social media posts and off the record statements from elected officials to "reinforce an already robust record" from the legislature. *NRA*, 441 F. Supp. 3d at 933-34.

This express goal of suppressing speech based on viewpoint distinguishes AB 587 from Florida and Texas's disclosure laws which were both upheld. In *Netchoice v. Paxton*, the Fifth Circuit upheld a Texas's HB 20's social media law which included disclosure of certain of content moderation policies as consistent with *Zauderer*. 49 F.4th at 487. Texas' HB 20 requires large social networks to post an acceptable use policy on its platform and issue reports to the government on what content, but rather it simply asks whether it was "due to the nature of the content as illegal content, illegal activity, or potentially policy-violating content." Tex. Bus. & Comm. Code § 120.052(b)(4)(1). This was facially view-point neutral. Similarly, the Eleventh Circuit upheld the bulk of Florida's SB 7072's disclosure provisions, which simply involved "standards, including detailed definitions, it uses or has used for determining how to censor, deplatform, and shadow ban." *Att'y Gen., Fla.*, 34 F. 4th at 1206-07.  The court applied *Zauderer*, contrasting it with other areas of the law which it held had viewpoint-based restrictions.

Unlike Florida and Texas's disclosure requirements, AB 587's requirements are viewpoint based—applying to constitutionally-protected speech. While differing in some respects, AB 587's closest analog is N.Y. Gen. Bus. Law § 394-ccc, which required social media companies to have policies on whether they ban hate speech. In striking down that law on First Amendment grounds, the Southern District of New York held that the "the policy requirement compels a social media network to speak about the range of protected speech it will allow its users to engage (or not engage) in." *Volokh v. James*, No. 22-CV-10195 (ALC), 2023 WL 1991435, at *7 (S.D.N.Y. Feb. 14, 2023). Through its onerous reporting requirements, AB 587 makes a similar unconstitutional demand.

### 3.    AB 587 unduly burdens speech.

The Attorney General "carries the burden to demonstrate that [AB 587's] requirement is not unjustified or unduly burdensome." *Am. Beverage Ass'n v. City &*

*Cnty. of San Francisco*, 916 F.3d 749, 757 (9th Cir. 2019) (internal quotations omitted).

Simply because a social network can afford to comply with AB 587, does not mean it is

not unduly burdensome. In *NFLIA*, the requirement that a clinic post a message which

said this "facility is not licensed as a medical facility by the State of California and has no

licensed medical provider who provides or directly supervises the provision of services"

in numerous languages and specific fonts was viewed as "drown[ing] out speech" and

therefore burdensome. 138 S. Ct. at 2378.

Here, the statute will affect Salem's "editorial decisions regarding thousands of

postings on its social media platforms as it must consider whether Attorney General

Bonta will agree with its categorization, flagging, and actioning of those posts." (Dkt. 20

¶ 107.) The required disclosures and reporting will chill speech and *Zauderer* does not

apply. *See Am. Beverage Ass'n*, 916 F.3d at 757 (required disclosures chilled speech and

were therefore unduly burdensome).

**III.   Plaintiffs' overbreadth claim is actionable.**

Under the "First Amendment overbreadth doctrine, a statute is facially invalid if it

prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S.

285, 292 (2008). AB 587 chills eight different categories of protected speech.

The Attorney General argues Plaintiffs "misunderstand[] the statute," arguing that

AB 587 requires reporting only on the categories of speech if the platforms themselves

define these categories, citing to in Cal. Bus. & Prof. Code § 22677(a)(3). (Dkt. 23-1 at

24:13-14.) This misreads AB 587. What the Attorney General does not discuss is the

language further down in the reporting requirements, which requires "[i]nformation on

content that was flagged by the social media company as content belonging to any of the

categories described in paragraph (3)" *Id.* § 22677(a)(5)(A). That obligation is not

cabined by any "if so" language. Covered platforms, like Salem Media, must account to

the Attorney General for their treatment of the content or face penalties and fines. Cal.

Bus. & Prof. Code § 22678. Again, as AB 587's most vocal advocates contended prior to

and at the time the bill was enacted, this statute is about chilling and "protecting"

1  Californians from speech protected by the First Amendment. *See Acorn Invs., Inc. v. City*
2  *of Seattle*, 887 F.2d 219, 226 (9th Cir. 1989) (holding that "disclosure statute that
3  potentially chills protected expression cannot stand if the information sought is not
4  reasonably related to the furtherance of a legitimate and substantial governmental interest
5  in regulating the protected activity"). Finally, the Attorney General's discussion of
6  *O'Handley v. Weber*, 62 F.4th 1145 (2023) (9th Cir. 2023), and *O'Handley v. Padilla*,
7  579 F. Supp. 3d 1163 (N.D. Cal. 2022), is irrelevant here because Plaintiffs do not allege
8  that AB 587 turns social networks into First Amendment state actors.

9  **IV.    AB 587 is unconstitutionally vague.**

10  "To trigger heightened vagueness scrutiny, it is sufficient that the challenged
11  statute regulates and potentially chills speech which, in the absence of any regulation,
12  receives some First Amendment protection." *California Tchrs. Ass'n v. State Bd. of*
13  *Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001). Plaintiffs' pleading triggers this scrutiny.
14  Plaintiffs allege in detail the problems inherent in applying the undefined terms in AB
15  587 to content moderation. (Dkt. 20 ¶¶ 44-48.) Plaintiffs also articulate the stakes for
16  getting anything wrong. (*Id.* ¶¶ 49-50.) This also contradicts the Attorney General's claim
17  that "Plaintiffs do not explain why those terms," i.e., the categories of speech subject to
18  AB 587, "are either vague or indefinite." (Dkt. 23-1 at 25:24.).

19  AB 587 is vaguer than another California statute recently struck down by a federal
20  district court. Even though the California Legislature defined "misinformation" in that
21  law, the district court determined it was too vague. *Hoeg v. Newsom*, No. 2:22-CV-01980
22  WBS AC, 2023 WL 414258, at *12 (E.D. Cal. Jan. 25, 2023). AB 587 is even worse,
23  since it does not define "misinformation" or other speech categories, a recipe for
24  "discriminatory enforcement." *Id.* at *7 (quoting *Williams*, 553 U.S. at 304).

**CONCLUSION**

26  For the foregoing reasons, Plaintiffs respectfully pray that this Court denies the
27  Attorney General's motion to dismiss.

28

ENVISAGE LAW

Dated: June 5, 2023                    ENVISAGE LAW

                                       By:____/s/ James R. Lawrence, III_____
                                              James R. Lawrence, III

                                       Attorneys for Plaintiffs Minds, Inc.,
                                       Tim Pool, The Babylon Bee LLC, and
                                       National Religious Broadcasters

21