ROB BONTA
Attorney General of California
PAUL STEIN
Supervising Deputy Attorney General
SHARON L. O'GRADY
Deputy Attorney General
State Bar No. 102356
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3834
Fax: (415) 703-1234
E-mail: Sharon.OGrady@doj.ca.gov
*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **MINDS, INC., et al.,**<br>Plaintiffs,<br>v.<br>**ROBERT BONTA,**<br>Defendant. | 2:23-cv-02705- RGK-MAAx<br>**DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT**<br>Date: June 26, 2023<br>Time: 9:00 a.m.<br>Courtroom: Roybal 850<br>Judge: The Honorable R. Gary Klausner<br>Trial Date: None set<br>Action Filed: April 13, 2023 |

## TABLE OF CONTENTS


| | Page |
|---|---|
| Argument | 1 |
| I. Plaintiffs Lack Standing and Their Claims Are Not Ripe. | 1 |
| II. Plaintiffs' First Amendment Claim Fails as a Matter of Law. | 5 |
| A. The Disclosures Are Purely Factual and Uncontroversial. | 5 |
| B. California Has a Substantial Interest in Requiring Disclosure. | 8 |
| C. Plaintiff's Undue Burden Argument Is Meritless. | 10 |
| III. Plaintiffs' Overbreadth Claim Fails as a Matter of Law. | 10 |
| IV. Plaintiffs' Vagueness Claim Fails as a Matter of Law. | 10 |
| Conclusion | 10 |

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Am. Meat Inst. v. U.S. Dep't of Agric.*
760 F.3d 18 (D.C. Cir. 2014) (en banc) .......... 9

*Am. Unites for Kids v. Rousseau*
985 F.3d 1075 (9th Cir. 2021) .......... 5

*Bantam Books, Inc. v. Sullivan*
372 U.S. 58 (1963) .......... 4

*Beeman v. Anthem Prescription Mgmt., LLC*
165 Cal. Rptr. 3d 800 (Cal. 2013) .......... 9

*CTIA – Wireless Assn. v. City of Berkeley*
928 F.3d 832 (9th Cir. 2019) .......... 6

*Forsyte v. Nationalist Movement*
505 U.S. 123 (1992) .......... 4

*Hunt v. Wash. State Apple Advert. Comm'n*
432 U.S. 333 (1977) .......... 5

*Inland Empire Waterkeeper v. Corona Clay Co.*
17 F.4th 824 (9th Cir. 2021) .......... 5

*John Doe No. 1 v. Reed*
561 U.S. 186 (2010) .......... 9, 10

*Kennedy v. Warren*
66 F.4th 1199 (9th Cir. 2023) .......... 9

*Lamont v. Postmaster General*
381 U.S. 301 (1965) .......... 4

*LSO, Ltd. v. Stroh*
205 F.3d 1146 (9th Cir. 2000) .......... 4

*N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health*
556 F.3d 114 (2d Cir. 2009) .......... 9

## TABLE OF AUTHORITIES
## (continued)

**Page**

*National Institute of Family & Life Advocates v. Becerra*
138 S.Ct (2018) ........ 8

*Nationwide Biweekly Admin. v. Owen*
873 F.3d 716 (9th Cir. 2017) ........ 8

*NetChoice, LLC v. Att'y Gen.*
34 F.4th 1196 (11th Cir. 2022) ........ 6

*NetChoice, LLC v. Paxton*
49 F.4th 439 (5th Cir. 2022) ........ 2, 6

*Prison Legal News v. Livingston*
683 F.3d 201 (5th Cir. 1980) ........ 4

*S.F. Apartment Ass'n v. City & Cnty. of S.F.*
881 F.3d 1169 (9th Cir. 2018) ........ 9

*Twitter v. Paxton*
56 F.4th 1170 (9th Cir. 2022) ........ 3, 5, 10

*Volokh v. James*
– F. Supp. 3d –, No. 22-CV-10195 (ALC), 2023 WL 1991435 (S.D.N.Y. Feb. 14, 2023) ........ 6, 7

*Zauderer v. Office of Disciplinary Counsel*
471 U.S. 626 (1985) ........ 6

**STATUTES**

California Business and Professions Code
§ 22675(f) ........ 1
§ 22676 ........ 1
§ 22676(a) ........ 8
§ 22677(a)(3) ........ 1, 5, 7, 8, 10
§ 22677(a)(4)(A) ........ 1
§ 22677 (a)(5) ........ 1, 7, 8

## TABLE OF AUTHORITIES
## (continued)

**Page**

Florida Statute
§ 501.2041(2)(a) ........................................................................ 6

Texas Business and Commerce Code
§ 120.052 ........................................................................ 6

**CONSTITUTIONAL PROVISIONS**

United States Constitution
First Amendment ........................................................................ 3, 5, 8, 9
Article III ........................................................................ 3

Plaintiffs' Opposition, Docket entry 26, is based entirely on their distorted reading of Assembly Bill (AB) 587 and speculation that the Attorney General will use the statute to punish social media companies that do not aggressively moderate "hate speech," "misinformation," and other disfavored content on their platforms. As set forth in the motion to dismiss, Docket entry 23-1, and in further detail below, they fail to establish standing, and their claims fail as a matter of law in any event.

## ARGUMENT

### I. PLAINTIFFS LACK STANDING AND THEIR CLAIMS ARE NOT RIPE.

AB 587 has two components, a requirement that social media companies disclose certain information to their users, §§ 22675(f), 22676, and a requirement that social media companies report certain information to the Attorney General so it can be compiled and made available to the public on the Attorney General's website, § 22677. In order to establish standing, Plaintiffs argue that the statute somehow gives the Attorney General *carte blanche* to threaten fines and other consequences as a means of dictating how social media companies moderate content on their platforms. Opp'n at 8-9, 20, Docket entry 26. They further contend that AB 587 requires social media companies to flag content as "hate speech," "misinformation," etc., even if their terms of service do not use those categories. *Id*. at 19. Their construction of the statute flies in the face of the plain language of the law. AB 587 simply requires reporting of "*whether* the current version of the terms of service define each of the following categories of content, and, *if so*, the definitions of those categories," as well as "[*a*]*ny* existing policies intended to address the categories," and "information on content that was *flagged by the social media company as content belonging to any of the categories* …." § 22677(a)(3), (a)(4)(A), & (a)(5). Thus, it is entirely up to social media companies to decide whether a particular post should be flagged or actioned and why (*see* Mot. to Dismiss at 4-5, Docket entry 23-1), and Plaintiffs do not and cannot point to anything in the statute that says otherwise.

Indeed, Plaintiffs' contorted reading is primarily based on an open letter by the Attorney General to Facebook and other platforms that mentions AB 587 along with a number of other statutes (Opp'n at 4, Docket entry 26; *see* Exh. 6 to Req. for Judicial Notice, Docket entry 23-8), but that letter is not even part of the statute's legislative history—a point that Plaintiffs do not and cannot contest. In any event, Plaintiffs twist the letter, which correctly characterizes AB 587 as a "transparency" measure, and nowhere suggests that AB 587 gives the Attorney General power to "second guess" and penalize a platform's own categorization, flagging, or actioning of content. *Id*. Plaintiffs' theory of standing boils down to an unfounded fear that the Attorney General will *misuse* AB 587, which is insufficient to confer standing. *Cf. NetChoice, LLC v. Paxton*, 49 F.4th 439, 485 (5th Cir. 2022), *petition for cert. docketed*, No. 22-555 (U.S. Dec. 19, 2022).[1]

Plaintiffs also ask this Court to assume that AB 587 will make it "*more likely*" that very large social media companies will alter their content-moderation policies and decisions in a way that restricts Plaintiffs' and others' free speech. Opp'n at

---

[1] In that case social media platforms challenged Texas's disclosure requirements on the theory that the state "might find the [required] disclosures inadequate and file suit." *Id*. at 485. The court rejected the argument, holding that "the Platforms have no authority suggesting the fear of litigation can render disclosure requirements unconstitutional—let alone that the fear of hypothetical litigation can do so in a pre-enforcement posture." *Id*. at 486 (italics added). The court also rejected the social media companies' suggestion that Texas would enforce the law's reporting "requirement in a particularly intrusive manner, such as by '"demand[ing] access to platforms' raw data,"' holding that "[a]t best, they've shown that some of the transparency report's disclosures, if interpreted in a particularly demanding way by Texas, *might* prove unduly burdensome . . . . But none of these contingencies have materialized. And even if they did, a court would need to evaluate them on a case-by-case basis." *Id*. at 486 (italics in original). Although the Fifth Circuit addressed these issues in the course of discussing the merits of the social media companies' claims, the court's reasoning applies here, too: Plaintiffs cannot establish standing by pointing to hypothetical, speculative possibilities that the Attorney General might seek to aggressively enforce AB 587 in an intrusive and demanding fashion, particularly given that the statute leaves it entirely up to social media companies to decide whether to flag or action content on their platforms.

9:21, 10:11 (italics added). But this just highlights the fact that, even though the disclosure requirement has been in effect for nearly six months, there are no factual allegations that *any* social media company – *including Salem Media Group, Inc*. – has actually done so as a result of AB 587. Nor does the FAC allege that any Plaintiff has actually been subject to "censorship" by a social media platform as a result of AB 587.

Nor can Plaintiffs manufacture standing by arguing that they are bringing a "pre-enforcement challenge" governed by a more "relaxed First Amendment standard." Opp'n at 7. Plaintiffs allege and argue extensively that AB 587 was designed specifically to squelch and punish speech disfavored by the government, including Plaintiffs' own speech, and that this is borne out by the Attorney General's open letter to Facebook, the author's comments about the bill, and other statements. Opp'n at 1-2, 4. Thus, the FAC is properly viewed as asserting a retaliation claim, rather than a pre-enforcement challenge to AB 587. *See Twitter v. Paxton*, 56 F.4th 1170, 1174-75 (9th Cir. 2022) (complaint alleging that Texas Attorney General "targeted [Twitter] specifically with the [civil investigative demand] and related investigation" for its decision to ban former President Trump from the platform was properly viewed as a retaliation claim for standing purposes). And, in a retaliation case, the standing inquiry "focuses directly on the three elements that form the 'irreducible constitutional minimum' of Article III standing." *Id*. at 1174 (citation omitted). As explained in the motion to dismiss, Plaintiffs fail to meet that test because they allege no injury-in-fact beyond speculative possibilities. *See id.* at 1175-76 (holding that Twitter's allegations of self-censorship were too vague and conclusory to establish standing). Even viewing the FAC as asserting a pre-enforcement challenge, it still fails to adequately allege standing, because, as explained, Plaintiffs' theory of injury is based on a distorted reading of the statute's actual requirements, which is

insufficient to show an "*actual or well-founded fear* that the law will be enforced" against Plaintiffs or any of them. *Id*. at 1174 (italics added).[2]

Finally, the cases on which Plaintiffs rely are readily distinguishable. As explained, AB 587 does not restrict what anyone can say on social media, nor does it require social media platforms to take, or not take, action against any particular item of content or user. Thus, it is nothing like the restrictions at issue in *Prison Legal News v. Livingston*, 683 F.3d 201, 212-13 (5th Cir. 1980) (finding standing to challenge prison regulation that prevented publisher from sending certain books to inmates); *Lamont v. Postmaster General*, 381 U.S. 301, 302, 305 (1965) (finding standing to challenge post office restriction preventing members of the public from receiving "communist political propaganda" through the mails); or *Forsyte v. Nationalist Movement*, 505 U.S. 123, 132-34 (1992) (finding standing to challenge a permitting requirement that operated as a prior restraint on speech). *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 61-62, 64 & n.6 (1963), and *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1153-54 (9th Cir. 2000), are also inapposite, as both involved threats of prosecution for publishing or distributing content deemed obscene or otherwise harmful by the government. Again, notwithstanding Plaintiffs' conclusory assertions that AB 587 "censors" speech, it does not dictate what a social media platform can or must do with respect to *any* content posted by users.[3]

The cases Plaintiffs cite in support of their claim that Plaintiff National Religious Broadcasters ("NRB") has associational standing are similarly unhelpful

---

[2] The principle that a court must accept as true the factual allegations of the FAC does not apply to unreasonable inferences or legal conclusions, such as Plaintiffs' mischaracterization of AB 587. *See* Mot. to Dismiss at 8, Docket entry 23-1.

[3] Plaintiffs' further suggestion that they should be permitted to sue because "dominant tech firms" like Google and Facebook are "less likely to challenge" AB 587 (Opp'n at 11, 12) is both unavailing and puzzling. These companies have not shied from challenging other laws and government actions in the social media space, but they have not challenged AB 587. Regardless, even if Plaintiffs were right that Google and Facebook have less incentive to challenge AB 587, that would not excuse Plaintiffs' failure to allege their own injury-in-fact.

to them. In each, the plaintiff-association alleged an actual, specific injury to a member (or de facto member). *Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 824, 833-34 (9th Cir. 2021) (standing found based on declarations of plaintiff's members identifying specific interests that were harmed); *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1097 (9th Cir. 2021) (standing found where member suffered stress and anxiety from having to continue teaching in classroom containing illegal levels of PCBs); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 335 (1977) (standing found where state commission composed of elected apple growers and dealers allegedly suffered specific injuries to its interests).

Here, in contrast, Plaintiffs argue that NRB has a single member (Salem Media) that is subject to AB 587's disclosure requirements, and that "AB 587 will compel Salem Media to 'censor speech to avoid penalties.'" Opp'n at 8, Docket entry 26 (quoting FAC, ¶ 121.) But that is simply a conclusory allegation of the FAC based on Plaintiffs' contorted interpretation of the statute. Salem is not a party to this case, and Plaintiffs' allegation that AB 587 will somehow force Salem to censor speech (either its own or others') is simply unsupported speculation. The FAC contains no allegations of fact that plausibly support that conclusion. Notably, Plaintiffs do not allege that Salem has actually changed its terms of service or taken any other action to censor speech in response to AB 587. Regardless, AB 587 by its terms could not give rise to a *reasonable* fear of prosecution or censorship, and Plaintiffs' theory that the Attorney General might enforce the statute to retaliate against platforms that do not moderate content for hate speech and the other section 22677(a)(3) categories plainly is too vague and speculative to support standing. *See Twitter, Inc. v. Paxton*, 56 F.4th at 1175.

## II. PLAINTIFFS' FIRST AMENDMENT CLAIM FAILS AS A MATTER OF LAW.

### A. The Disclosures Are Purely Factual and Uncontroversial.

Plaintiffs argue that AB 587 is a viewpoint-based speech regulation because it requires disclosures that relate to hate speech and the other categories listed in the

statute, and thus are controversial. But Plaintiffs base this proposition on cases that *restrict speech*, not cases that *require disclosure*. *See* cases cited in Opp'n at 13-14, Docket entry 26. Commercial disclosure requirements are analyzed under *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985). *See e.g., CTIA – Wireless Assn. v. City of Berkeley*, 928 F.3d 832, 842-43 (9th Cir. 2019).

Both Circuit Courts that have addressed similar disclosure requirements imposed on social media platforms have held that *Zauderer* provides the correct legal standard and have upheld them. *See NetChoice, LLC v. Att'y Gen.* 34 F.4th 1196, 1230-31 (11th Cir. 2022), *petition for cert. docketed*, No. 22-277 (U.S. Sept. 23, 2022); *NetChoice, LLC v. Paxton*, 49 F.4th at 485.[4] Plaintiffs argue that AB 587 is unlike the Florida and Texas disclosure requirements, and that the New York statute at issue in *Volokh v. James*, – F. Supp. 3d –, No. 22-CV-10195 (ALC), 2023 WL 1991435 (S.D.N.Y. Feb. 14, 2023), provides the "closest analog," Opp'n at 18, Docket entry 26, but that statute is strikingly different. It requires social media networks to "devise and implement a written policy" that allows users to complain about "hateful conduct," defined by the statute to mean "conduct which

[4] The Texas statute at issue in *Netchoice LLC v. Paxton*, 34 F.4th at 1230, provides: "(a) A social media platform shall publish an acceptable use policy in a location that is easily accessible to a user. [¶] (b) A social media platform's acceptable use policy must: [¶] (1) reasonably inform users about the types of content allowed on the social media platform; [¶] (2) explain the steps the social media platform will take to ensure content complies with the policy; [¶] (3) explain the means by which users can notify the social media platform of content that potentially violates the acceptable use policy, illegal content, or illegal activity, which includes: [¶] (A) an e-mail address or relevant complaint intake mechanism to handle user complaints; and [¶] (B) a complaint system described by Subchapter C; and [¶] (4) include publication of a biannual transparency report outlining actions taken to enforce the policy." Texas Bus & C. Code § 120.052. The Florida disclosure statute at issue in *NetChoice, LLC v. Att'y Gen.*, 34 F.4th at 1230 provides: "A social media platform must publish the standards, including detailed definitions, it uses or has used for determining how to censor, deplatform, and shadow ban." Fla. Stat. § 501.2041(2)(a). Thus, under both laws, social media platforms that moderate conduct based on hate speech or other catagories must disclose that (and under Florida law must provide definitions), requirements that the Fifth and Eleventh Circuits held were permissible under *Zauderer.*

tends to 'vilify, humilate, or incite violence' 'on the basis of race, color, religion, ethnicity, national origin, disability, sex, sexual orientation, geneder identity or gender expression.'" *Id*. at *5. In contrast, AB 587 does not require social media platforms to allow their users to complain about "hate speech" or the other categories listed in § 22677(a)(3), let alone define those categories for social media platforms. It simply requires platforms to post their terms of service, including the procedure for users to flag content that "they believe violate [*the platform's*] terms of service …." § 22677(a)(3) (italics added). And, in semiannual reports to the Attorney General, social media companies must state "*whether* the current version of the terms of service defines each of the following categories of content and, *if so*, the definitions of those categories, including *any* subcategories …." § 22677(a)(3). The reports must also include "[i]nformation on content that was flagged by the social media company as content belonging to any of the categories described in paragraph [22677(a)(3)] …." § 22677(a)(5). Thus, Plaintiffs are flatly incorrect in arguing that "[n]othing in the statute limits this reporting to categories already in a platform's terms of service." Opp'n at 9, Docket entry 26. By referring back to "the categories described in [§ 22677(a)(3)]," section 22677(a)(5) makes it crystal clear that reporting on posts flagged or actioned as "hate speech," "misinformation" etc. is only required *if the platform itself categorizes and defines content as such.* Similarly, Plaintiffs are asking the court to ignore the plain text of the statute by arguing that the reporting obligation in section 22677(a)(5) is "not cabined by any 'if so' language." Opp'n at 19. Section 22677(a)(5) is expressly and unequivocally cabined by "if so language" because it refers back to 22677(a)(3), which leaves it up to social media companies to categorize and define the content on their platforms as they see fit. Thus, Plaintiffs' attempts to show that AB 587 is somehow "viewpoint based" and closely analogous to the law at issue in *Volokh* (Opp'n at 18) are meritless.

Plaintiffs' further reliance on *National Institute of Family & Life Advocates v. Becerra*, 138 S.Ct, 2361 (2018), is similarly unavailing. Opp'n at 15-16, Docket entry 26. The Supreme Court held the statutorily-required notice at issue there "in no way relates to the services that licensed clinics provide. Instead, it requires these clinics to disclose information about *state*-sponsored services—including abortion, anything but an 'uncontroversial' topic." *Id*. at 2372 (italics in original). The Court was clear: "we do not question the legality of health and safety warnings long considered permissible, or purely factual and uncontroversial disclosures about commercial products." *Id*. at 2376. Here, social media platforms must report information on content flagged by them as "hate speech," "misinformation" etc. *only if* their terms of service *already* categorize content on the platform as such. § 22677(a)(3), (a)(5). The platforms alone get to decide whether to do that; thus, the required disclosures are purely factual and non-controversial. "The First Amendment does not generally protect corporations from being required to tell prospective customers the truth." *Nationwide Biweekly Admin. v. Owen*, 873 F.3d 716, 721 (9th Cir. 2017).

**B. California Has a Substantial Interest in Requiring Disclosure.**

Plaintiffs do not appear to dispute that California has an interest in mandating disclosures that allow consumers to make informed decisions, but argue that, if social media companies are free to decide whether to moderate "hate speech" and "misinformation" etc., and to "subjectively" define those categories (and they are free to do so), then "the justification for AB 587 collapses" because "there are no comparisons to be made." Opp'n at 16, Dockey entry 26. To the contrary, the statute requires social media companies to post their current terms of service, allowing direct comparisons. § 22676(a). It also requires them to report information on content they have flagged or actioned "as content belonging to any of the categories" (§ 22677(a)(5)), and leaves it up to them to define those categories, but that does not mean the statute produces "no discernible benefit."

Opp'n at 17. AB 587 will provide more information than consumers currently have about content-moderation decisions that plaforms have made, and the fact that it may not facilitate strictly apples-to-apples comparisons in that respect does not mean the statute will not be useful. Plaintiffs cite no cases to the contrary, and it is not the province of the Court to judge the wisdom or efficacy of AB 587, merely whether it is designed to serve a legitimate state interest.

Plaintiffs' further argument that the state "has no interest in the suppression of political advocacy" (Opp'n at 17, Docket entry 26), while generally true, assumes the premise—that AB 587 suppresses speech, which it does not. Their related argument that the government may not compel disclosures with the goal of bringing *public pressure* to bear on social media companies is also unfounded. Many disclosure/transparency statutes are designed to encourage public scrutiny of business practices. *See, e.g., Beeman v. Anthem Prescription Mgmt., LLC*, 165 Cal. Rptr. 3d 800, 816, 821-22 (Cal. 2013) (upholding law requiring prescription drug claim processors to compile and disclose information on pharmacy fees, despite argument that information would be used to influence public debate on drug reimbursement rates); *S.F. Apartment Ass'n v. City & Cnty. of S.F.*, 881 F.3d 1169, 1176-77 (9th Cir. 2018) (upholding ordinance requiring landlords to provide tenants with information about tenants' rights organizations before engaging in lease buyout negotiations); *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 27 (D.C. Cir. 2014) (en banc) (upholding regulation requiring disclosure of country-of-origin information for meat); *N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health*, 556 F.3d 114 (2d Cir. 2009) (upholding ordinance requiring restaurants to post calorie content on menus). *Cf. Kennedy v. Warren*, 66 F.4th 1199, 1208 (9th Cir. 2023) (holding that "[g]enerating public pressure to motivate others to change their behavor is a core part of public discourse" and passes First Amendment scrutiny). *John Doe No. 1 v. Reed*, 561 U.S. 186, 201 (2010), cited by Plaintiffs, is inapposite. Under the "exacting scrutiny" standard applicable to challenges in the electoral

context, the Supreme Court upheld the mandatory public dislosure of referendum petitions, while noting that the ruling would not prevent a narrower challenge if plaintiffs could show that disclosure would subject petition signers to threats, harassment or reprisals if their names were dislosed. *Id*. at 928.

**C. Plaintiff's Undue Burden Argument Is Meritless.**

Plaintiffs' undue burden claim rests simply on its speculation that the statute "will affect Salem's editorial decisions," and that the statute's requirements "will chill speech." Opp'n at 19, Docket entry 26. This would be insufficient even if Salem were a named plaintiff making allegations as to its own state of mind – and it is not. *See Twitter, In. v. Paxton*, 56 F.4th at 1175-1176.

**III. PLAINTIFFS' OVERBREADTH CLAIM FAILS AS A MATTER OF LAW.**

Plaintiffs' overbreadth claim relies, again, on their strained reading that AB 587 requires platforms to moderate content based on the categories listed in section 22677(a)(3). Opp'n at 19-20. As discussed above, this is simply incorrect.

**IV. PLAINTIFFS' VAGUENESS CLAIM FAILS AS A MATTER OF LAW.**

Plaintiffs' vagueness argument simply refers to their own conclusory allegations that the categories in section 22677(a)(3) are vague. This again ignores that social media companies are not required to categorize content in any particular way by AB 587; it is up to them to decide whether to label and take action against "hate speech," "misinformation," etc., and to provide *their own definitions of those categories*, if they choose to use them in their terms of service at all. The allusion to the possibility that the Attorney General will enforce the law to punish disclosures "not to his liking," FAC ¶ 49, Docket entry 20, falls far short of alleging a plausible claim because it is based on a blatant misreading of the statute.

**CONCLUSION**

The Court should dismiss the FAC without leave to amend.

Dated: June 12, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
PAUL STEIN
Supervising Deputy Attorney General

*/s/ Sharon L. O'Grady*
SHARON L. O'GRADY
Deputy Attorney General
*Attorneys for Defendant*

SA2023302140

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendant, certifies that this brief contains 4,224 words, which:

X complies with the word limit of L.R. 11-6.1.

X complies with the word limit set by court order dated April 13, 2023.

Dated: June 12, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California

*/s/ Sharon L. O'Grady*
SHARON L. O'GRADY
Deputy Attorney General
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

Case Name: **Minds, Inc., et al. v. Robert Bonta** No. **2:23-cv-02705- RGK-MAAx**

I hereby certify that on June 12, 2023, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on June 12, 2023, at San Francisco, California.

K. Figueroa-Lee
Declarant

Signature

SA2023302140
43753184.docx